Jeffrey WILLIAMS *v.* STATE of Arkansas

CR 94-352                                895 S.W.2d 913

Supreme Court of Arkansas
Opinion delivered April 3, 1995
[Rehearing granted July 3, 1995.]

*Hood & Conner*, by: *Jeff R. Conner*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Acting Deputy Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant, Jeffrey Williams, appeals the judgment of the Washington County Circuit Court, filed October 14, 1993, convicting him of one count of refusal to submit to arrest, a Class B misdemeanor, Ark. Code Ann. § 5-54-103(b) (Repl. 1993), and sentencing him to a $500.00 fine, court costs, and ninety days in the Washington County jail, conditionally suspending the fine and jail term. We have jurisdiction of this appeal pursuant to Ark. Sup. Ct. R. 1-2(a)(3) and (d), respectively, because appellant questions the constitutionality of section 5-54-103, and because the appeal was certified to this court by the court of appeals. Appellant asserts four points of error. We find no merit and affirm the judgment.

## FACTS

On October 23, 1992, Governor Bill Clinton, the Democratic Presidential candidate, appeared at a rally in support of his campaign in Fayetteville on the campus of the University of Arkansas.

The rally was attended by a crowd of approximately 10,000 persons, among them a group of approximately 40 supporters, of the Republican incumbent, President George Bush. Appellant was one of these Republican supporters.

During the rally, University of Arkansas Police Department ("UAPD") Officer Michael Daub was approached by a Clinton staff worker who said "There's a fight" and directed Daub to an area near the press table and speakers' platform. In that area, Daub saw several persons, holding "Bush/Quayle" signs, jumping up and down. Daub observed appellant forcibly and violently knocking the people who stood in front of him with his body as he jumped up and down. Daub stated that appellant "was almost foaming at the mouth," that the people in front of him "were about ready to take him on," and that Daub was afraid there would be a large fight and perhaps a riot at the rally.

Daub advised appellant not to push anyone, but appellant continued to do so and replied "I have freedom of speech." Daub ordered appellant to leave, but appellant did not obey. Daub radioed for backup, and, shortly thereafter, was joined by two UAPD officers, Sgt. John Reid and Lt. Gary Crain, and Deputy Harris of the Washington County Sheriff's Patrol. Upon arrival at the scene, Reid observed the disturbance. Reid saw appellant standing near Daub, screaming about his rights, and shouting Republican slogans. Reid observed pushing going on in the crowd around appellant. Upon arrival at the scene, Crain also observed the disturbance. Crain saw appellant jumping up and down and bumping into people.

Reid and Crain each advised appellant that he was under arrest and ordered him to move out of the area. Appellant began to leave, then changed his mind and slumped to a sitting position on the ground. Daub and Harris unsuccessfully attempted to pick up appellant. Crain interceded and applied a "pain compliance" technique, intended to motivate appellant to leave on his own power, which was accomplished by Crain first steadying appellant's head in the crook of Crain's arm (described by appellant as a "headlock"), then applying pressure with his thumb to a nerve below appellant's ear. Appellant stood up and walked a few steps. Crain advised appellant to leave the area, or he would apply the pressure again. Appellant walked with the officers to

a patrol car where he was examined for weapons and handcuffed for transport. Appellant stated he understood the officers who told him to leave were law enforcement officials, but did not realize he was or might be under arrest until Crain put him into the "headlock."

Appellant was found guilty of refusal to submit to arrest by the Fayetteville Municipal Court, and appealed his case to the Washington County Circuit Court where a non-jury trial was conducted on September 16, 1993. At trial, Officers Daub, Crain and Reid testified for the prosecution; appellant, five other Republican supporters who attended the rally, and a journalist who had photographed portions of the incident testified for the defense. Conflicting evidence was introduced regarding whether and when appellant was placed under arrest for disorderly conduct, and whether and when he refused to submit to that arrest.

At the conclusion of the trial, the circuit court judge delivered his findings of fact from the bench. The trial court stated that appellant "ha[d] every right in the world" to be at the rally and was exercising constitutionally guaranteed rights. The trial court held that the real issue, however, was whether appellant violated section 5-54-103, a "very simple statute." The court found that the evidence was overwhelming that appellant knew the UAPD officers were police officers. The trial court found that the proof as to the only remaining issue, that is, whether appellant submitted to arrest, was disputed, and the trial court concluded the issue was one of credibility. The trial court found that, in the totality of the circumstances, appellant "simply for whatever reason chose to ignore the police officers." The trial court pronounced appellant guilty of refusal to submit to arrest, and, on October 14, 1993, filed the order of guilt and sentence from which this appeal is taken.

## ARGUMENT

Appellant presents four points for reversing his conviction for failure to submit to arrest:

(1) the trial court erred in refusing to consider his constitutional challenges to section 5-54-103,

(2) the trial court erred in refusing to admit evidence

regarding the illegality of appellant's arrest for disorderly conduct,

(3) the trial court erred in refusing to permit appellant to use a videotape of the incident in cross-examination, and in refusing to allow narration of the videotape, and

(4) section 5-54-103 is unconstitutional as written and as applied to appellant because it denied him his constitutional rights.

The heart of appellant's appeal is grounded in the constitutional challenges to section 5-54-103 which he raises in his fourth and final point. It is implicit in each of appellant's first two points that he is assuming section 5-54-103 is unconstitutional to establish any prejudice to him as a result of the trial errors posited in those points. Therefore, we first proceed to a consideration of appellant's constitutional arguments.

## CONSTITUTIONAL ARGUMENTS

The statutory subsection at issue, section 5-54-103(b), reads as follows:

(b)(1) A person commits the offense of refusal to submit to arrest if he knowingly refuses to submit to arrest by a person known by him to be a law enforcement officer effecting an arrest;

(2) "Refusal," as used in this subsection, means active or passive refusal;

(3) *It is no defense to a prosecution under this subsection that the law enforcement officer lacked legal authority to make the arrest, provided he was acting under color of his official authority;*

(4) Refusal to submit to arrest is a Class B misdemeanor. [Emphasis added.]

Appellant argues that section 5-54-103(b) is unconstitutional, as written and as applied in this case, under the First and Fourth Amendments of the federal Constitution, and under Article II, Section 6 of the Arkansas Constitution. The gist of appellant's argument is that the statute mandated his submission to an

illegal arrest during his participation at a political rally, and, therefore, violated his Fourth Amendment right against unreasonable seizures of his person, and his state and federal constitutional rights to freedom of speech.

We do not address appellant's Fourth Amendment argument which he raises for the first time on appeal. *Claiborne* v. *State*, 319 Ark. 537, 892 S.W.2d 511 (1995). Even constitutional arguments which are not raised before the trial court are not properly preserved for our review and are waived on appeal. *Id.; Wetherington* v. *State*, 319 Ark. 37, 889 S.W.2d 34 (1994).

Appellant cites *Wright* v. *Georgia*, 373 U.S. 284 (1963), for the proposition that the state cannot constitutionally punish a person for refusing to obey a police officer's order which itself violates the constitution, and urges that *Wright* is controlling of this case. In *Wright*, "six young Negroes, were convicted of breach of the peace for peacefully playing basketball in a public park[.]" *Id.* at 285. The testimony of the arresting officers themselves, in that case, was that the arrests were based solely upon their intention to enforce racial discrimination in the park. The Supreme Court reversed the convictions as violative of the Equal Protection Clause of the Fourteenth Amendment and as unconstitutionally vague.

On the record before us, we do not agree that *Wright* is controlling of this case. The *Wright* decision is clearly distinguishable in two respects. First, the petitioners in *Wright* did not resist or refuse to submit to their arrests; consequently, the Court did not address the issues raised in this case. Second, the record does not show that appellant's arrest was based solely upon the arresting officers' intention to impermissibly interfere with appellant's First Amendment rights[1]. *Cf. Livingston* v. *State*, 610 So. 2d 696 (Fla. Dist. Ct. App. 1992) (reversing conviction for disorderly conduct where the underlying arrest was illegally based solely on defendant's use of protected First Amendment speech).

---

[1]We here note that, for purposes of this appeal only, appellee concedes that appellant's underlying arrest for disorderly conduct was illegal for lack of probable cause. However, even assuming, *arguendo*, that his arrest was illegal for that reason, appellant refers us to no decision in which a court has recognized that a conviction for refusal to submit to an arrest which was illegal for lack of probable cause, unconstitutionally violated the arrestee's *freedom of speech* rights.

█ Although, as the trial court found, appellant had a right to be at the rally exercising his constitutional rights, the record shows that the UAPD officers also had a colorable basis for their warrantless arrest of appellant where his disorderly conduct was committed in their presence. Ark. R. Crim. P. 4.1(a)(iii). The testimony of the arresting officers does not indicate that the arrest was based solely upon their intention to chill appellant's rights to freedom of speech. Indeed, the record shows that the UAPD officers did no more than discharge their duty by defusing a potentially dangerous situation before it could escalate into violence.

Appellant cites a federal district court case, *United States ex rel. Kilheffer* v. *Plowfield*, 409 F. Supp. 677 (E.D. Pa. 1976), in which the petitioner for habeas corpus had been convicted by a Pennsylvania state court of obstructing an officer in the execution of process when the petitioner gathered with other youths in a public park, insulted police officers, protested police orders to disperse, and then resisted his arrest for disorderly conduct. The petitioner argued that his conviction violated his federal constitutional rights, including freedom of speech. The district court framed the issue before it as, assuming without deciding that the arrest was unlawful, did the petitioner have a federal constitutional right to resist an unlawful arrest? In denying the petition, the district court held "that at least absent unusual circumstances there exists no such federal constitutional right." *Id.* at 680 (citing *United States ex rel. Horelick* v. *Criminal Court*, 366 F. Supp. 1140 (S.D.N.Y. 1973) *rev'd on other grounds*, 507 F.2d 37 (2d Cir. 1974)). The federal court summarily disposed of the petitioner's freedom of speech argument by observing that the state court had concluded the petitioner's conduct was not protected by the First Amendment.

The proposition for which appellant cites *Kilheffer* is that a federal constitutional right to resist an unlawful arrest remains in certain limited circumstances, *e.g.*, when the arrest is flagrantly abusive because the arrestee is engaging in an indisputably lawful activity and his resistance is so carefully calculated as to render negligible the risk that physical force need be used. Appellant's characterization is inaccurate because the *Kilheffer* court merely observed, in dictum, that it may be that a right to resist an unlawful arrest should be recognized in such circumstances.

In the *Horelick* decision cited by the *Kilheffer* court, a habeas corpus petitioner there argued, as does appellant, that his conviction for resisting arrest could not stand because the underlying arrest was unlawful, and resisting it simply constituted disobedience to an unlawful order, which the Supreme Court has held, *e.g., Wright*, 373 U.S. 284, in some circumstances at least, cannot constitutionally be punished. In rejecting this argument, the *Horelick* court noted that, although various constitutional bases for such a right have been suggested, none has been accepted by the courts. The *Horelick* petitioner's First Amendment rights were not argued specifically.

The *Horelick* court contrasted cases such as *Wright*, in which it was held the petitioner could not be punished for refusal to obey an unconstitutional police *order*, with cases such as the one before it, in which the petitioner argued he could not be punished for refusal to obey an unconstitutional *arrest*. The district court stated:

> The question remains, however, whether resistance to an unlawful *arrest* more closely resembles refusal to obey an unlawful police order, which is not punishable, than disobedience of a constitutionally defective court order, which the Court has held *is* punishable by contempt. *Walker* v. *Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967)[2].

> An unlawful arrest, like both a police order and a court order, can result in immediate interference with enjoyment of constitutional rights. *It differs, however, from the former and resembles the latter in that an unlawfully arrested person like an unlawfully restrained one has open to him an opportunity to vindicate his rights in court. . . . Put oth-*

---

[2]In *Walker*, the City of Birmingham obtained a temporary injunction restraining the petitioners from participating in a mass street parade without a permit as required by city ordinance. After the petitioners marched in violation of the injunction, a contempt hearing was held. The petitioners sought to attack the injunction, among other reasons, as an unconstitutional restraint upon free speech. The state court had refused to consider the constitutional arguments, ruling the only issues before it were whether it had jurisdiction to issue the injunction and whether petitioner had knowingly violated it. The Supreme Court affirmed the state court, holding that the petitioners could not bypass orderly judicial review of the injunction before disobeying it.

*erwise, the arrest and the court order have built into them the potential of submitting the dispute to the impartial determination of courts of law (including the appellate courts).* [Emphasis added.]

*Horelick*, 366 F. Supp. at 1151. The *Horelick* court concluded that *Walker* controlled its decision, not *Wright*, and held that the petitioner's resisting arrest conviction was proper because he had no constitutional right to resist the arrest and because the common-law right to resist arrest had been preempted by New York state law.

Similarly, Arkansas has statutorily restricted the common-law right to resist arrest, even if the arrest is illegal. The policy reasons for this modification are stated in the commentary to Arkansas Statutes Annotated § 41-2803 (now section 5-54-103(a)), adopted in 1975[3], which provides, in pertinent part as follows:

At common law a person could use reasonable non-lethal force in resisting an unlawful arrest. . . . Subsection 41-2803(3) [providing that illegal arrest is no defense to a charge of resisting] aligns Arkansas with Alaska, California, Delaware, Illinois and New Jersey in modifying this traditional rule. See, Annot., 44 A.L.R. 3rd 1078 (1972). A private citizen cannot use force to resist an arrest by one who he knows is a law enforcement officer performing his duties, regardless whether the officer had authority to make the arrest. *The place to litigate the legality of an arrest is in a court, not the streets.* The principle embodied in subsection (3) is repeated in § 41-512 — justification: use of physical force in resisting arrest prohibited. As discussed in the *Commentary to § 41-512*, neither that section nor this one applies when the illegality of the arrest stems from use of excessive force by the officer. [Emphasis added.]

*See also Kilheffer*, 409 F. Supp. 677, 680-82 and *Horelick*, 366 F. Supp. 1140, 1150-51 (discussing the modern trend to modify the common-law right to resist unlawful arrest).

---

[3]Subsection 5-54-103(b) was added in 1987, without additional legislative commentary.

Consistent with the legislative purpose for section 5-54-103, appellant's remedy for any violation of his constitutional rights stemming from his arrest was to submit his dispute to the impartial determination of a court of law, including, if appropriate, an action for damages. *Kilheffer*, 409 F. Supp. 677. His remedy was not to refuse to submit to his arrest.

██ Our statutes are presumed to be constitutional, and all doubt is resolved in favor of the statute's constitutionality. *Beck* v. *State*, 317 Ark. 154, 876 S.W.2d 561 (1994); *Stone* v. *State*, 254 Ark. 1011, 498 S.W.2d 634 (1973). Appellant has the burden of proving that section 5-54-103(b) is unconstitutional. *Beck*, 317 Ark. 154, 876 S.W.2d 561. On this record, we find that appellant has not carried his burden of proving that section 5-54-103(b) unconstitutionally violated his freedom of speech rights, as it is written or as it was applied in this case.

## OTHER ARGUMENTS

In light of our holding that appellant has failed to prove his constitutional argument, we summarily dispose of appellant's first and second points on appeal, each of which relied upon the success of appellant's constitutional attack on section 5-54-103 to establish that he suffered any prejudice as a result of the trial errors alleged in those first two points.

Appellant's third point for reversal relates to a videotape, approximately nine minutes in duration, depicting portions of the sequence of events at the Clinton rally which resulted in appellant's arrest. The videotape was filmed by a defense witness, Micah Neal, who testified that he stood only a few feet from appellant at the rally. The videotape also included an audio track.

During Neal's direct testimony, the videotape was admitted into evidence, and the trial judge stated that he would view the videotape at the conclusion of all testimonial evidence. The trial judge stated that the videotape "will speak for itself," and that he would not permit additional narration as the tape was viewed. At the conclusion of the testimony of the final defense witness, the trial judge viewed the videotape, without narration.

██ Appellant argues that it was error to preclude narration of the videotape. We do not address this argument because the abstract shows that no corresponding objection was made in

the trial court, hence appellant has failed to preserve the argument for appeal.

Finally, appellant argues the trial court erred in ruling that appellant could not use the videotape for further cross-examination or in examining recalled witnesses, and that the trial judge erred in refusing to permit him to make a proffer of the excluded evidence. The record shows that, at the conclusion of the testimony of the final defense witness, appellant's counsel stated that the defense had no other witnesses, excepting those who might be recalled after the trial judge viewed the videotape. Appellant's counsel also stated he would like to have an opportunity to use the videotape during further cross-examination of the UAPD officers. Appellee's counsel interjected that the prosecution would be calling no additional witnesses, thus there would be no further cross-examination for appellant. The trial judge instructed appellant's counsel that the defense would not be permitted to call any witnesses after the trial judge viewed the videotape. Appellant's counsel stated that he had no further questions for the witness, whereupon the trial judge called a recess and viewed the videotape. The defense then rested.

The following colloquy ensued:

MR. CONNER [APPELLANT'S COUNSEL]: I want to make a proffer at this point for the record what would have happened had I been allowed to show additional — show this tape again in the presence of additional witnesses, what evidence that would have brought out, and I offer it, I proffer it at this point. That's all I have.

THE COURT: Well, are you saying you have a witness that can look at this tape and basically point out certain subliminal things that I haven't seen or may not be able to see?

MR. CONNER: Yes, sir. Absolutely. Absolutely.

THE COURT: Who is that witness?

MR. CONNER: There's a number of them, Judge.

THE COURT: Well, I mean, who?

MR. CONNER: Well, the officers, all three officers,

Mr. Williams and the other people who show — you can't tell who they are, but they can say, "That's me and here's what's happening at this point." That's all I'm saying is if I would be allowed to do that, that's what the evidence would show.

THE COURT: Mr. Conner, I know of no procedure that's been approved by any court that would permit that. Now, I've viewed the tape and I'm going to consider that tape in making my decision and I think I heard what the audio portions of it stated and I think I was able — the monitor is some fifteen feet from me here, it's a clear monitor. I was able to see what the tape depicted. And I've certainly heard numerous witness testify as to what occurred out there. And the issues still in my judgment are rather simple.

MR. CONNER: Yes, sir. I wasn't attempting to argue your ruling. I was just trying to make a proffer.

THE COURT: I understand what you're doing and I'm not taking it as argument or anything, but I'm not going to permit you to do it.

This court has stated that a proffer of evidence is governed by Rule 103 of the Arkansas Rules of Evidence. *Arkansas Valley Elec. Coop. Corp.* v. *Davis*, 304 Ark. 70, 800 S.W.2d 420 (1990) (citing *Jones* v. *Jones*, 22 Ark. App. 267, 739 S.W.2d 171 (1987)). In *Jones*, our court of appeals considered an issue of first impression in this state, that is, whether a trial court may properly refuse a proffer of excluded evidence, and quoted persuasive authority from the New Mexico Supreme Court which held that the right to proffer excluded evidence is "almost absolute." *Jones*, 22 Ark. App. 267, 270, 739 S.W.2d 171, 172 (quoting *State* v. *Shaw*, 90 N.M. 540, 565 P.2d 1057 (1977)). The *Jones* court held that under certain circumstances, a trial court may be justified in rejecting a proffer and noted those examples given by the *Shaw* court, *e.g.*, when the proffer is untimely or the tendered proof is clearly repetitious.

The trial court in this case did not permit appellant to make a complete proffer of the excluded evidence, that is, the commentary from the witness stand of each recalled witness as

he or she viewed the videotape. However, the record shows that the trial court was sufficiently advised of the nature of this excluded evidence to permit it to intelligently consider appellant's request. Implicit in the trial judge's ruling is his determination that the excluded evidence was cumulative or repetitious, in light of the fact that ten witnesses, including the three UAPD officers specifically identified in appellant's limited proffer, had testified as to the events depicted in the videotape, and the trial judge, as the fact finder, had viewed the videotape. On this record, we find the trial court committed no clear error.

Affirmed.

DUDLEY and BROWN, JJ., dissent.

ROBERT H. DUDLEY, Justice, dissenting. In October of 1992, just before the general election, Governor Bill Clinton, then the nominee of the Democratic Party for President of the United States, appeared at a campaign rally on the campus of the University of Arkansas. Appellant Williams, with some members of the Arkansas College Republicans, attended the rally and displayed "Bush\Quayle" signs. Appellant was ordered to leave by an officer of the University of Arkansas Police Department. He refused. Two officers advised appellant that he was under arrest for disorderly conduct and ordered him to move out of the area. He sat down and "went limp." He was physically removed from the scene and was charged with disorderly conduct and refusal to submit to arrest.

He was found guilty in municipal court and appealed to circuit court. In circuit court he was found guilty of refusal to submit to arrest. He appeals to this court. The majority opinion affirms the conviction for refusal to submit to arrest even though appellant was not allowed to fully present his First Amendment defense to the charge.

At the beginning of the trial in circuit court, appellant's counsel stated that he wished to challenge the "refusal to submit to arrest" statute, Ark. Code Ann. § 5-54-103 (Repl. 1993), because as it applied to appellant, it violated the First Amendment. The city attorney responded that the constitutional challenge was untimely because it had not been raised by motion ten days prior to trial. *See* A.R.Cr.P. Rule 16.2(b). The circuit court took

the matter under advisement and later refused to consider the constitutional challenge because it was not timely brought. The ruling was in error for two reasons. If the ruling was based on rule 16.2(b), it was in error because that rule establishes that a motion to suppress evidence must be filed ten days before the trial date. The motion was not one to suppress evidence. Rather, it was an argument that appellant had a fundamental right of free speech under the Constitution of the United States and that right, so long as lawfully exercised, was dominant over the state statute, which, as applied, was unconstitutional. Moreover, appellant's attorney had notified the city attorney of the defense months earlier, and appellant timely raised the issue at trial. .

As a result of the trial court's ruling, appellant was not allowed to put on proof that supposedly would show that all he did was hold up a "Bush/Quayle" sign in exercise of his right to free expression. The trial court ruled that it "was irrelevant whether Mr. Williams was merely holding a sign and doing nothing else wrong or not violating any law or regulation prior to his arrest." The trial court's ruling was based only on the applicable parts of Ark. Code Ann. § 5-54-103, which are:

> (b)(1)  A person commits the offense of refusal to submit to arrest if he knowingly refuses to submit to arrest by a person known by him to be a law enforcement officer effecting an arrest; . . .

> (3)  It is no defense to a prosecution under this subsection that the law enforcement officer lacked legal authority to make the arrest, provided he was acting under color or his official authority.

*Id.* § 5-54-103(b)(1) & (3).

It is undisputed appellant refused to submit to arrest and that the university police were acting under color of official authority.

The Attorney General seeks to avoid a remand for proof on the constitutional question by conceding that the arrest of appellant "was illegal because the police lacked probable cause" to arrest appellant for disorderly conduct. The majority opinion accepts the Attorney General's argument and, in a far-reaching opinion, holds that even when a policeman patently violates a citizen's First Amendment rights, the citizen must voluntarily

submit to that violation or be convicted of a crime. I respectfully dissent. The real question is whether a citizen ought to be *convicted of a crime* solely for refusing to submit to a patently unlawful deprivation of his First Amendment rights.

The common law right to resist unlawful arrest has fallen into disfavor with the General Assembly and most citizens, as well it should, for practical reasons. Today a person wrongfully arrested can make bail, utilize numerous procedural safeguards, pursue remedies, and initiate civil damage actions against the police officer and the offending government. There is the civilized notion that the place to settle a dispute over the validity of an arrest is in a court of law, and not on the campus of a university or out in the streets. However, to assert that adequate legal remedies now exist to redress false arrests is to misconstrue the rationale behind the right. The right does not exist to encourage citizens to resist arrest, but rather to protect from punishment those who passively resist representatives of the government from illegally taking away *fundamental* rights. Even when one wholeheartedly accepts the philosophy that unlawful arrests should be dealt with in a civil manner, *there still exist a few occasions when fundamental rights guaranteed under the Constitution are patently at risk and stand to be forever lost. Under those limited circumstances it is in violation of the Constitution to convict a person for refusal to submit to an illegal arrest when that nonviolent refusal was essential to the vindication of those rights. See* Paul G. Chevigny, *The Right to Resist an Unlawful Arrest*, 78 Yale L.J. 1128 (1969).

The crime of which appellant stands convicted is *refusal to submit to arrest*, section 5-54-103(b)(1), and not *resisting arrest*, section 5-54-103(a)(1). The crime of resisting arrest involves affirmative physical force and violence and creates a substantial risk to all in the immediate area. It is the common law right to actively "resist arrest" which has fallen into disfavor. Today's notion of civility dictates that one cannot resist police by affirmative physical force even for the illegal deprivation of one's fundamental rights. Quite different, the "refusal to submit" in this case was passively sitting down and "going limp" while the policeman wrongly deprived appellant of his right of free speech.

Freedom of speech is fundamental to the functioning of a

democracy. It is a fundamental right guaranteed by the First Amendment. In the limited category of fundamental rights cases, refusal to submit to an illegal abridgement of one's freedom of speech, *without being convicted of a crime*, can be essential to the vindication of the right. To dramatize the fallacy of the reasoning of the majority opinion, assume that the policeman, instead of illegally arresting appellant, illegally arrested now President Clinton for exercising his right of free speech, but President Clinton "refused to submit" to the illegal arrest. The speech at the rally would be forever lost, and, egregiously, under the majority opinion, President Clinton would be subject to punishment for refusing to submit to a patent violation of his fundamental right. Aside from that dramatic hypothetical example, the paradigm case is the one in which the right to refuse to submit is exposed by a typical street incident: A policeman sees a group of men on a corner and tells them to move on. One refuses. In order to maintain his authority, the policeman illegally arrests the man. He refuses to submit and will be convicted of a crime for that refusal to submit. *See* Chevigny, *supra*. Another case might be the policeman who walks into a newspaper plant and tells the manager to stop the press. The manager refuses. The policeman illegally arrests the manager. He refuses to submit to the oppression and will be convicted of the crime of refusal to submit. As a matter of principle in a democratic society, it is unconscionable to convict a citizen, no matter what his or her status, for refusing to submit to the illegal deprivation of his right of free speech.

> The flaw in the statutes and court decisions which purport to abolish the right to resist is that they create a situation where the citizen is trapped by the legal system. If he obeys a patently arbitrary arrest, he has submitted to oppression, and if he resists, he may be convicted for his resistance. Surely there can be no more embittering experience of the criminal process than such a conviction. The freedom to refuse to obey a patently unlawful arrest is essential to the integrity of a government which purports to be one of laws, and not of men. Unless it is desirable to kill the impulse to resist arbitrary authority, the rule that such an arrest is a provocation to resist must remain fundamental.

Chevigny, *supra*, at 1147.

The "refusal to submit" to the illegal denial of one's fundamental right of speech may be essential to the vindication of that right. As noted by one author:

> First amendment rights, in particular, may need such protection. The police frequently arrest political demonstrators even though the demonstrators are acting lawfully. These arrests are often patently illegal, and mild resistance is not uncommon. Resistance, such as going limp, is part of the effort to continue the lawful demonstration. Arrests under these circumstances may be highly provocative, but provocation is not the issue here; reasonable resistance should be legitimated in order to protect the first amendment freedom. Were there no right to resist such arrests, the resisting arrest statute would afford the police an easy tool for curbing the exercise of first amendment rights. Whenever a lawful arrest for demonstrating might be barred by the first amendment, the simplest thing for the police to do would be to arrest the demonstrators unlawfully. The demonstration would then be terminated with little risk of consequences to the police; those who resisted could be convicted of obstructing an officer, while those who submitted would necessarily cease the conduct found offensive by the authorities. As applied to warrantless arrests which patently violate first amendment rights, therefore, any statute which limits the common law right to resist should be held unconstitutional.

Chevigny, *supra*, at 1138.

The Supreme Court of the United States has expressly held that an accused cannot be *punished* for violating an illegal and arbitrary police order. In *Wright* v. *Georgia*, 373 U.S. 284 (1963), six young black males were playing basketball in a public park customarily used only by whites. The police ordered the young blacks to leave the park. One asked the officer, "[b]y what authority," but did not create a disturbance as they were transported to police headquarters. *Id.* at 286. They were charged and convicted of assembling "for the purpose of disturbing the public peace" and *not dispersing at the command of the officers*. There was no evidence of disorderly conduct or any activity which might be thought to violate a breach of the peace statute. The Supreme

Court reversed, and in the pertinent part of the unanimous opinion, wrote:

> Three possible bases for petitioners' convictions are suggested. First, it is said that failure to obey the command of a police officer constitutes a traditional form of breach of the peace. Obviously, however, *one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution.* The command of the officers in this case was doubly a violation of petitioners' constitutional rights. It was obviously based, according to the testimony of the arresting officers themselves, upon their intention to enforce racial discrimination in the park. For this reason the order violated the Equal Protection Clause of the Fourteenth Amendment. See *New Orleans Park Improvement Assn.* v. *Detiege,* 358 U.S. 54, affirming 252 F.2d 122. The command was also violative of petitioners' rights because, as will be seen, the other asserted basis for the order — the possibility of disorder by others — could not justify exclusion of the petitioners from the park. *Thus petitioners could not constitutionally be convicted for refusing to obey the officers.* If petitioners were held guilty of violating the Georgia statute because they disobeyed the officers, this case falls within the rule that a generally worded statute which is construed to punish conduct which cannot constitutionally be punished is unconstitutionally vague to the extent that it fails to give adequate warning of the boundary between the constitutionally permissible and constitutionally impermissible applications of the statute. Cf. *Winters* v. *New York,* 333 U.S. 507; *Stromberg* v. *California,* 283 U.S. 359; see also *Cole* v. *Arkansas,* 333 U.S. 196.

*Id.* at 291-92 (emphasis added).

The majority opinion endeavors to distinguish *Wright* from the case at bar by stating:

> First, the petitioners in *Wright* did not resist or refuse to submit to their arrests; consequently, the Court did not address the issues raised in this case. Second, the record does not show that appellant's arrest was based solely upon

the arresting officers' intention to impermissibly interfere with appellant's First Amendment rights.

The supposed distinguishing factors can only be inferred by conjecture because the trial court refused to allow appellant to present his evidence that allegedly would have shown that he just held up a "Bush/Quayle" sign and, after the illegal police order, only sat down and "went limp." The trial court ruled that appellant did not raise his constitutional defenses in a timely manner, and, under the applicable statute, the trial court ruled that it "was irrelevant whether Mr. Williams was merely holding a sign and doing nothing else wrong or not violating any law or regulation prior to this arrest."

*Wright* is directly in point and has been held to be in point by other courts. Using similar reasoning, the Supreme Court of Florida held that even though Florida had a "resisting arrest" statute, a conviction under that statute must be reversed when the act of the officer was illegal. *Licata v. State*, 24 So. 2d 98 (Fla. 1945); *see also Livingston v. State*, 610 So. 2d 696 (Fla. Dist. Ct. App. 1992).

The majority opinion also cites *Walker v. City of Birmingham*, 388 U.S. 307 (1967), but that case involved an injunction issued by a court. Process issued by a court stands in a fundamentally different position from an illegal police command. The federal district court in *United States ex rel. Horelick v. Criminal Court*, 366 F. Supp. 1140 (S.D.N.Y. 1973), *rev'd on other grounds*, 507 F.2d 37 (2d Cir. 1974), cogently set out the differences as follows:

> *Undeniably, the Court has held that a person cannot be punished for refusal to obey a police order which violates his constitutional rights.* [Emphasis added.] *See, e.g., Shuttlesworth v. Birmingham*, 382 U.S. 87, 86 S. Ct. 211, 15 L. Ed. 2d 176 (1965); *Wright v. Georgia*, 373 U.S. 284, 83 S. Ct. 1240, 10 L. Ed. 2d 349 (1963). The question remains, however, whether resistance to an unlawful *arrest* more closely resembles refusal to obey an unlawful police order, which is not punishable, than disobedience of a constitutionally defective court order, which the Court has held *is* punishable by contempt. *Walker v. Birmingham*, 388 U.S. 307, 87 S. Ct. 1824, 18 L. Ed. 2d 1210 (1967).

An unlawful arrest, like both a police order and a court order, can result in immediate interference with enjoyment of constitutional rights. It differs, however, from the former and resembles the latter in that an unlawfully arrested person like an unlawfully restrained one has open to him an opportunity to vindicate his rights in court. These rights are not irrevocably compromised by initial compliance as they are in the case of the person who obeys a police order and who, as a result, forever loses his chance to contest it by allowing the policeman the final say. Put otherwise, the arrest and the court order have built into them the potential of submitting the dispute to the impartial determination of the courts of law (including the appellate courts). *The unlawful police order, on the other hand, if obeyed, makes the policeman the final arbiter.* [Emphasis added.] This distinction persuades us that Horelick's situation is controlled not by *Shuttlesworth* and *Wright*, but by *Walker.*

*Id.* at 1151.

In summary, it is fundamentally correct to excuse a citizen who passively refuses to submit to an unlawful police action that takes away his First Amendment rights. The purpose of excusing that person is not to encourage violence in the streets, but to preserve the sense of personal liberty that is inherent in the right to reject illegal commands. To permit police officials to illegally provoke citizens into committing the crime of "refusing to submit" to an unlawful arrest creates a trap for citizens which must, in the long run, injure the integrity of the judicial system and damage the democracy. I would remand this case so that the constitutional issue might be developed by the parties and considered by the circuit court. For these reasons, I respectfully dissent from the majority opinion.

ROBERT L. BROWN, Justice, dissenting. I join in much of Justice Dudley's dissent and write to emphasize that the trial court erred in failing to address the constitutional issues of Mr. Williams' political free speech. It is not for this court to develop the facts and the law surrounding that issue, but that is exactly what the majority opinion does. Here, the State concedes that the arrest was illegal. Like Justice Dudley, I would remand the matter for the trial court's consideration and resolution of the First Amendment issue.

SUPPLEMENTAL OPINION UPON
GRANTING REHEARING
JULY 3, 1995

901 S.W.2d 831

1. APPEAL & ERROR — TRIAL COURT SHOULD HAVE ALLOWED APPEL-
   LANT OPPORTUNITY TO PRESENT TESTIMONY ON WHETHER PROBABLE
   CAUSE EXISTED AT THE TIME OF HIS INITIAL ARREST — REQUEST FOR
   A REMAND TO THE LOWER COURT FOR A FULL DEVELOPMENT OF THE
   FACTS GRANTED. — Where the trial court failed to afford appellant
   the opportunity to present relevant testimony on whether probable
   cause existed at the time of his initial arrest, the appellant's request
   for a remand to the lower court for a full development of the facts
   was granted.

2. APPEAL & ERROR — EXPLANATORY TESTIMONY CONCERNING A VIDEO-
   TAPE NOT ALLOWED — TESTIMONY PROPERLY EXCLUDED AT TRIAL. —
   The trial court's denial of appellant's request to present explana-
   tory testimony related to a videotape which had been introduced
   into evidence was not in error.

Petition for Rehearing granted.

*Jeff R. Conner*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Deputy Att'y
Gen., Senior Appellate Advocate, for appellee.

TOM GLAZE, Justice. In his original brief in this appeal, Jef-
frey Williams argued in his second point for reversal that the trial
court erred in refusing to admit his testimony bearing on the ille-
gality of his arrest for disorderly conduct. Specifically, Williams
contended he was denied an opportunity to present testimony on
whether probable cause existed at the time of his initial arrest.
The trial court declared such testimony was irrelevant. Follow-
ing that ruling, the trial court also denied Williams the opportu-
nity to proffer testimony concerning the probable cause issue.
The thrust of Williams' argument on this point was that the trial
court's rulings frustrated his attempt to show he was doing noth-
ing wrong before the officers ordered him to leave, and no basis
existed for the charge of disorderly conduct. In sum, Williams
asserted that the "trumped up" disorderly conduct charge was
merely used by the officers to remove him and "bootstrap" them-
selves into obtaining a conviction for refusal to submit to arrest.

In our original review of this cause, we mistakenly failed to address Williams' second point as described above. Williams suggests our opinion improperly considered the officers' testimonies concerning the probable cause issue even though the trial court had refused him the opportunity to develop evidence on that issue. While Williams' arguments, constitutional and otherwise, seem to overlap and appear confusing in some respects, we are convinced of two things. First, the trial court was wrong in not affording Williams the opportunity to present testimony on whether probable cause existed at the time of his initial arrest. Such testimony was relevant. If probable cause did, in fact, exist, Williams' constitutional arguments are arguably preempted even if those arguments had been timely preserved. Second, the trial court compounded its error by denying Williams the opportunity to proffer testimony bearing on the probable cause issue. *See* Ark. R. Evid. 103(a)(2).

■ In view of the above, we grant Williams' request for a remand to the lower court for a full development of the facts. If the constitutional issues argued by Williams are viable after further development of relevant testimony in this cause, the trial court may then address them.

■ One additional point needs mentioning since this matter will require further evidentiary proceedings on remand. Concerning this court's original opinion as it involved Williams' request to present explanatory testimony related to a videotape which had been introduced into evidence, we reiterate our holding that the trial court did not err in excluding such testimony. *See Williams* v. *State*, 320 Ark. at 211, 222-223, 895 S.W.2d 913 (1995).

For the foregoing reasons, we grant Williams' petition for rehearing.