Oscar E. MOORE *v.* STATE of Arkansas

CR 94-590                                        915 S.W.2d 284

Supreme Court of Arkansas
Opinion delivered February 19, 1996

*Bramblett & Pratt,* by: *James M. Pratt, Jr.,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Clint Miller,* Deputy Att'y Gen., Sr. Appellate Advocate for appellee.

ANDREE LAYTON ROAF, Justice. Appellant Oscar E. Moore was convicted of capital murder and rape of a ninety-year-old neighbor, and of the burglary of her home. He was sentenced as an habitual offender to life without parole for the capital murder. He raises four points on appeal of his conviction and sentence, that the trial court erred in 1) refusing to suppress results of testing of appellant's blood; 2) admitting DNA matching and probability testimony without conducting a preliminary hearing; 3) refusing to grant a mistrial when the state's witness testified that appellant had admitted to committing another murder unrelated to this case; and 4) permitting an investigating officer to give lay opinion testimony that the appellant's tennis shoes matched a footprint found at the scene of the murder.

We agree that the trial court erred in not declaring a mistrial, and reverse and remand. Moore's remaining points are discussed to the extent they are relevant to a second trial.

### Facts

On the morning of November 4, 1990, a neighbor went to the home of Ms. Nethealve Cannon and after being unable to get a response from her, kicked in a door and discovered her body. Ms. Cannon had blood on her nose, mouth and legs, and her undergarments were removed; she had been raped, strangled and her home had been burglarized.

Appellant lived with his mother across the road from Ms. Cannon and was present outside her home when her body was discovered. Appellant was heard to say that Ms. Cannon had only had a heart attack and should be taken to the hospital, and that her death would probably be pinned on him because he had been in some trouble lately. A tennis shoe print was discovered in Ms. Cannon's bedroom near where her undergarments were found; the footprint was preserved and photographed.

Five days after Ms. Cannon's body was discovered, Lester "Fleabag" Parker informed police that he had gone to appel-

lant's home the night before Ms. Cannon's body was discovered, to collect money from appellant for a marijuana sale. Parker stated that appellant told him that he did not have the money at that moment, but that he had stolen $7200.00 from Ms. Cannon after killing her. Parker further contended that he did not believe that appellant had killed Ms. Cannon until her body was discovered the next day.

Based on Parker's information, the appellant was arrested, a search warrant was obtained for his home, and a pair of appellant's tennis shoes were recovered. The state crime lab could not conclusively say that appellant's tennis shoes matched the print found in Ms. Cannon's home.

Also, twenty days after the appellant's arrest and several days before the information was filed by the prosecution, investigators filed a Motion for Disclosure requesting that appellant's blood be drawn to compare with semen found in the decedent. Appellant had informed the court the day after his arrest that he was in the process of hiring an attorney, consequently an attorney had not been appointed for him on the date this order was issued and the blood drawn.

The FBI laboratory concluded that the DNA in appellant's blood matched the DNA in the semen recovered from Ms. Cannon and that the chance of randomly selecting an unrelated individual from the black population who would have the same DNA profile as the appellant was 1 in 500,000. The appellant moved to suppress the evidence from the blood alleging it was unlawfully obtained; this motion was denied. The appellant further moved to exclude the DNA testing results which declared the match and calculated the probability of a random match or, in the alternative, to require that the court hold a preliminary hearing, to determine whether the results of the DNA testing should be admitted into evidence in accordance with *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991). The trial court recognized *Prater*, but declined to order a preliminary hearing, reasoning that DNA testing was no longer a "novel" approach which warranted a preliminary hearing and, further, other jurisdictions had begun to take judicial notice of the reliability of DNA testing.

After hearing all the evidence, including testimony regard-

ing the DNA profiling, the jury found appellant guilty of capital murder, rape, and burglary and recommended a sentence of life imprisonment without parole for the capital murder.

### a. Mistrial

We agree that the trial court should have granted appellant's motion for mistrial during the testimony of Lester Parker. Parker had testified on direct examination that appellant had told him that he had killed Ms. Cannon on the night before her body was discovered. During the cross-examination by appellant's counsel, the following colloquy occurred:

> Q: Now, Fleabag, I don't suppose we could be so lucky as for you to tell us that there was somebody else besides you that heard Oscar Moore on this Saturday night confess to you that he had killed Ms. Cannon?
>
> A: Did —.
>
> Q: Oscar Moore, on this Saturday night that he confessed to you that he killed Ms. Cannon, there was nobody else present there, was there?
>
> A: No, but he admitted to killing another woman to his brother.

Appellant requested that the comment be struck, the jury be admonished, and made a motion for mistrial. The trial court denied the mistrial after a brief in-chambers hearing, and delivered an admonition to the jurors instructing them to disregard Parker's answer to the defense counsel's question.

■ Declaring a mistrial is a drastic remedy and proper only where the error is beyond repair and cannot be corrected by any curative relief. *Cupples* v. *State*, 318 Ark. 28, 883 S.W.2d 458 (1994). The trial court should resort to mistrial only where the error complained of is so prejudicial that justice cannot be served by continuing the trial or when the fundamental fairness of the trial itself has been manifestly affected. *Stewart* v. *State*, 320 Ark. 75, 894 S.W.2d 930 (1995). Since the trial court is in a better position to determine the effect of a remark on the jury, *Cupples, supra,* it has wide discretion in granting or denying a motion for a mistrial and its discretion will not be disturbed except where there is an abuse of discretion or manifest

prejudice to the movant. *Stewart, supra.* Finally, an admonition to the jury usually cures a prejudicial statement unless it is so patently inflammatory that justice could not be served by continuing the trial. *King v. State,* 317 Ark. 293, 877 S.W.2d 583 (1994).

■ We agree that Parker's unresponsive testimony that the appellant had admitted he killed another woman was so prejudicial that it could not be cured by an admonition to the jury. Here the trial court's denial of the motion for mistrial was abuse of discretion in the face of such a patently inflammatory and prejudicial statement. *See Lackey v. State,* 283 Ark. 150, 671 S.W.2d 757 (1984); *King v. State,* 9 Ark. App. 295, 658 S.W.2d 434 (1983).

### b. Suppression of blood tests

Appellant argues that his blood was drawn over his objection and when he was not represented by counsel, even though he had requested permission to talk to a lawyer immediately before his blood was drawn.

Prior to trial, appellant's counsel filed a motion to suppress the results of any scientific tests performed on the blood samples taken from appellant, asserting that the State had the samples drawn from appellant in violation of his constitutional rights under the Fourth and Fifth Amendments to the United States Constitution and in violation of Ark. R. Crim. P. 18.1. The motion was denied and appellant raises the same arguments on appeal.

### Fifth Amendment

■ We first address the appellant's Fifth Amendment argument because this claim may be more readily resolved. The appellant contends that his right to remain silent and not incriminate himself has been violated by the taking of his blood. He invokes the Fifth Amendment but cites no further authority; his argument is untenable. The protections of the Fifth Amendment do not extend to demonstrative, physical tests, but are intended to immunize a defendant from providing the State with evidence of a testimonial or communicative nature. *Gardner v. State,* 296 Ark. 41, 754 S.W.2d 518 (1988). In determining whether evidence is testimonial in nature the courts look to see if the activity

performed is for the purpose of communication, such as a gesture; if it is, the activity is privileged. *Urquhart* v. *State*, 273 Ark. 486, 621 S.W.2d 218 (1981). In *Schmerber* v. *California*, 384 U.S. 757 (1966), the United States Supreme Court determined that the privilege against self-incrimination does not bar compelled intrusions into the body for blood to be analyzed for alcohol content. Appellant's Fifth Amendment argument clearly has no merit.

### *Fourth Amendment*

■ Appellant also asserts that the order for blood withdrawal and the taking of the blood against his will constituted an unreasonable search and seizure forbidden by the Fourth and Fourteenth Amendments of the United States Constitution. There are two components to this argument. Appellant first argues that the search was not proper because the affidavit for probable cause to arrest him was based on the statement of Lester Parker, an unreliable informant. However, at issue is the probable cause which existed for the issuance of the order for withdrawal of appellant's blood, not his arrest. This court applies a "totality of circumstances" approach in determining whether the neutral and detached magistrate had a substantial basis for concluding that probable cause existed. *Rainwater* v. *State*, 302 Ark. 492, 791 S.W.2d 688 (1990).

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing] that probable cause existed."

*Id.* at 494, citing *Illinois* v. *Gates*, 462 U.S. 213 (1983).

■ In this instance, the trial court had a substantial basis in which to conclude that probable cause existed to grant the order for blood withdrawal. In addition to the statement of Parker, the affidavit of the state police investigator in support of the Motion for Disclosure recited: that he had been informed by

Lester Parker that the evening prior to the discovery of the victim's body appellant had informed Parker that he had killed Ms. Cannon; that black, high-top tennis shoes that had been recovered from appellant's bedroom matched the print of a large tennis shoe that was lifted and preserved from the victim's bedroom; that appellant claimed to have cleaned and cooked for Ms. Cannon on numerous occasions even though no one else could verify this claim; that appellant was seen with a large amount of money on the night after the murder, which was quite unusual because appellant did not have a job; that appellant informed the police that he had entered Ms. Cannon's house upon the discovery of her body, put her phone on top of a table, and covered Ms. Cannon's body with a blanket, while the individual who discovered the body stated that she was the only person to enter Ms. Cannon's house before the police arrived; and that because she kept her doors locked and would not unlock the door unless she knew the caller, the killer was probably known by Ms. Cannon.

With regard to Parker, appellant further argues that an affiant must demonstrate particular facts bearing on an informant's reliability as required by Ark. R. Crim. P. 13.1. *Jackson* v. *State*, 291 Ark. 98, 722 S.W.2d 831 (1987). However, no additional support for the reliability of witnesses is required where the witness volunteered the information as a good citizen and not as a confidential informant whose identity is to be protected. *Simmons* v. *State*, 278 Ark. 305, 645 S.W.2d 680 (1983). Although Parker, an admitted drug seller, may not be a model citizen, in this instance he did not play the role of an informant. In his statement, Parker said that he was "scared" and told his cousin, appellant's brother and his boss about appellant's confession before reporting the matter to the police, after his boss urged him to do so. Parker also voluntarily gave a blood sample for DNA analysis when requested by the police. Clearly, there was a substantial basis for the court to conclude that probable cause existed to order the taking of appellant's blood.

The second aspect of appellant's Fourth Amendment argument involves the taking of the blood sample. Appellant contends the search was not reasonable, because his blood was drawn in the police station, in violation of the order, and that it falls short of the standard for reasonableness provided by *Schmerber*,

*supra.* Although the order provided that appellant be taken to a medical facility, he was taken from his cell to the sheriff's office, where his blood was drawn in private, by a physician. In *Schmerber*, the Supreme Court held that a minor intrusion into the body performed in a reasonable manner (by needle) in a hospital by a physician, met the Fourth Amendment test of reasonableness. However, the Court cautioned:

> We are thus not presented with the serious question which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment - for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under those conditions might be to invite an unjustified element of personal risk and pain.

*Schmerber.*

■ Initially, we note that *Schmerber* does not expressly prohibit the taking of a blood sample in the manner employed in the instant case. Despite the cautionary language warning against conducting searches which employ medical techniques in other than medical environments, here the appellant's blood was drawn by a physician, not a police officer. As blood is routinely drawn by nurses, technicians, and other non-physicians, frequently in non-medical facilities, appellant was not in this instance subjected to an "unjustified element of personal risk and pain."

We consequently cannot say that the manner in which appellant's blood was taken constituted an unreasonable search, in violation of the Fourth Amendment.

### Ark. R. Crim. P. Rule 18.1

Appellant asserts Ark. R. Crim. P. 18.1(b) was violated because it requires that "reasonable notice" be given to a defendant and his counsel. Arkansas Rules of Criminal Procedure Rule 18.1 gives a judicial officer the authority to require a defendant to permit the taking of samples of his blood, hair and other materials of his body if it involves no unreasonable intrusion. This rule provides in pertinent part:

(a) Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, a judicial officer may require the defendant to:

(vii) permit the taking of samples of his blood, hair and other materials of his body which involve no unreasonable intrusion thereof;

(b) Whenever the personal appearance of the defendant is required for the foregoing purposes, *reasonable notice of the time and place of such appearance shall be given by the prosecuting attorney to the defendant and his counsel.* (Emphasis added.)

When appellant's blood was drawn, he had been in jail for twenty days on the charges involved in this case and did not have an attorney, although he was represented by a public defender on a pending unrelated burglary charge. On the date the blood was drawn, the state police investigator, with the help of the prosecutor, prepared a motion seeking permission to draw blood from appellant, obtained an order from the circuit judge granting the motion, filed the motion and order with the clerk, and picked up a physician and took him to the jail to draw the blood. The order provided that "a copy of the order shall be personally served on [appellant] and upon his attorney, should said attorney be made known to the Arkansas State Police or the prosecuting attorney's office," and that appellant be taken to the health department or other medical office for the drawing of blood. Appellant admitted at his suppression hearing that he was advised by the judge the day after his arrest that an attorney would be appointed for him if he could not afford to hire one; appellant at that time informed the court that he was "seeking the means to hire an attorney" and that he had already hired a lawyer because Investigator Glenn Sligh did not like him. He stated that he did not know his attorney's name.

Appellant further testified at the suppression hearing that he asked to call his mother and an attorney immediately before his blood was withdrawn but his requests were refused. State Police Investigator Glenn Sligh testified that he asked appellant who his lawyer was in order to serve the order on the attorney, and that appellant stated that his attorney was coming from Texas. Mr. Sligh further testified that he allowed appellant

to call his mother immediately prior to the drawing of the blood and that appellant was apparently seeking to determine if she had obtained a lawyer for him. He stated that appellant made no further mention of a lawyer after this call. Appellant's mother denied receiving a call from appellant that day and a jailer testified to hearing a sheriff's employee refuse to allow appellant to call his family or a lawyer, but stated that she did not recall seeing Mr. Sligh that day with the appellant. This court has repeatedly stated that conflicts in the testimony of the witnesses is for the trial court to resolve. *Smith* v. *State*, 296 Ark. 451, 757 S.W.2d 554 (1988).

Although appellant argues on appeal that he was deprived of counsel when his blood was drawn, it is clear that he initially caused the delay in the appointment of counsel by representing to the judge at his probable cause hearing that he had already hired an attorney. Appellant cannot decline appointed counsel on the one hand and later claim he was denied the assistance of counsel; this is akin to the invited error doctrine. He further argues that the order was obtained without affording him a hearing, and that he had no prior notice that the state intended or desired to draw his blood. Rule 18.1(b) provides that "whenever the personal appearance of the defendant is required [for the taking of samples], reasonable notice of the time and place of such appearance shall be given . . . to the defendant and his counsel." A defendant who must present himself for the taking of samples is contemplated by this language. Here, the appellant was in custody at the time, and was given a copy of the order immediately prior to the blood withdrawal.

Moreover, even if the State violated Rule 18.1(b), we have said that suppression of the evidence is not the appropriate remedy for this violation. *See Davasher* v. *State*, 308 Ark. 154, 823 S.W.2d 863 (1992). The standard of review on imposing sanctions for discovery violations is whether there has been an abuse of discretion. In *Davasher*, the defendant was represented by counsel, and argued that the failure to notify his counsel of the taking of samples from defendant shortly after his arrest was "prosecutorial misconduct" for which the remedy was suppression of the evidence. *Id.* at 163. We rejected this argument and stated that when there has been a failure to comply with discovery procedures, a trial court is not required to suppress evidence

unless prejudice will result. *Id.* at 164.

■ Here, as in *Davasher*, appellant does not explain how prejudice might have occurred because an attorney was not present when the blood samples were taken. Appellant suggests that had he been represented by counsel when the court determined whether to order his blood drawn, "it is possible that probable cause could have been shown to have been lacking," because Lester Parker's trustworthiness could have been challenged, and that the trial court "might have ruled differently if the truth were known." He further asserts that had the damaging blood test evidence not been submitted to the jury, there is a "reasonable probability" that the result below would have been different. However, appellant does not explain how the detailed investigator's affidavit presented with the Motion for Disclosure failed to meet the standard for probable cause for search warrants, or could have been attacked. In sum, even assuming a violation of Ark. R. Crim. P. 18.1(b) occurred, we cannot say that appellant has demonstrated that he suffered prejudice as a result.

■ Finally, we note that appellant argues for the first time in his reply brief that he had an absolute right to counsel in the blood withdrawal proceeding because Ark. R. Crim. P. 8.3(b) forbids any action being taken after a defendant's first appearance until the defendant and his counsel have had an opportunity to confer. He also asserts for the first time on appeal that the drawing of the blood sample violated his Sixth Amendment right to counsel. Neither of these arguments were made in his Motion to Suppress or Amended Motion to Suppress or argued to the trial court. We will not consider even constitutional arguments not raised before the trial court. *See Williams* v. *State*, 320 Ark. 211, 895 S.W.2d 913 (1995).

## c. DNA Matching and Probability Testimony

Prior to trial, the State advised the appellant that it intended to introduce test results conducted by the FBI laboratory which indicated a "match" in the DNA of semen found in the victim and the DNA of the blood drawn from the appellant. The State further announced plans to introduce, by population frequency statistics, the likelihood of the "match" being someone other than the appellant. Amending his motion to suppress, appellant requested a preliminary hearing to determine whether

the results of any DNA testing was admissible pursuant to the requirements of *Prater* v. *State*, 307 Ark. 180, 820 S.W.2d 429 (1991). The trial court determined that the preliminary hearing was not necessary and took judicial notice of the reliability of DNA profiling. The order denying the preliminary hearing provided in pertinent part:

> Since the filing of the motion and the request for a hearing, the court and the parties have reviewed current decisions regarding the DNA issue including, but not limited to *U.S.* v. *Martinez*, ＿＿ F.3d ＿＿ 62 USLW 2199, (8th Circuit September 2, 1993), *U.S.* v. *Jakobetz*, 955 F.2d 786 (2d Circuit), *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 125 L.Ed. 2d 469 (June 28, 1993). The Court has also reviewed a twenty-one page affidavit with exhibits attached of Audrey Grace Lynch. supervisory Special Agent, DNA Analysis Unit II, FBI, who conducted the forensic analysis of the DNA evidence involved in this cause. The affidavit indicates how the laboratory work was done and what analysis and assumptions underlie the probability calculations. The defendant, through his attorney, has advised the Court that his DNA expert witnesses have reviewed the laboratory notes of the FBI and if asked, would testify that the laboratory protocol was appropriate.

> The Court is aware that *Prater* v. *State* infra directed that a preliminary hearing or inquiry be conducted when novel scientific evidence coupled with evidence of mathematical probabilities is offered. The evidence offered is no longer new or unusual, there having been over 50 appellate court decisions which support the admissibility of forensic DNA-RFLP profiling. *DNA Evidence and Massachusetts*, Crime Laboratory Digest, Vol. 19, No. 3 July, 1993. Based on the above, the Court concludes that the DNA profiling was derived from the application of reliable methodology or principle and that according to the affidavit of the affiant finds she properly performed protocol involved in DNA profiling. Accordingly, the Court is of the opinion that no preliminary hearing is necessary.

The Court therefore takes judicial notice of the general theory and reliability as well as the techniques of DNA profiling. Based upon the affidavit of Audrey Grace Lynch and the statement of defendant's counsel that he has no evidence attacking the methodology of the FBI laboratory procedures, the Court further finds that the proposed testimony by the FBI witnesses is relevant and will be admitted.

This court adopted in *Prater* a relevancy standard in determining the admissibility of novel scientific evidence. The relevancy approach requires:

that the trial court conduct a preliminary inquiry which must focus on (1) the reliability of the novel process used to generate the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse or mislead the jury, and (3) the connection between the novel process evidence to be offered and the disputed factual issues in the particular case.

*Id.* at 186. Under this relevancy approach, reliability is the critical element.

However, as the trial court correctly noted, since we decided *Prater* in 1991, there have been significant developments regarding the admissibility of DNA profiling; a number of appellate courts have recognized the reliability of this process, and no longer consider it novel scientific evidence.

Two of the cases relied upon by the trial court, *U.S.* v. *Jakobetz*, 955 F.2d 786 (2nd Cir. 1992), and *U.S.* v. *Martinez*, 3 F.2d 1191 (8th Cir. 1993), warrant our consideration. Both hold that trial courts may take judicial notice of the reliability of DNA profiling. In *Jakobetz*, the court undertook an exhaustive analysis and discussion of the scientific background of DNA profiling and the legal standard of admissibility for novel scientific evidence, before concluding that the general theories of genetics which support DNA profiling are unanimously accepted in the scientific community and that the specific techniques used by the FBI laboratory in DNA analysis are commonly used by scientists in microbiology and genetics research.

In *Martinez, supra*, the court relied heavily on the *Jakobetz*

decision, stating, "We conclude that the Second Circuit's conclusions as to the reliability of the general theories and techniques of DNA profiling are valid under the Supreme Court's holding in *Daubert*, and hold that future courts can take judicial notice of their reliability." However, the *Martinez* court further stated that its holding does not mean that expert testimony concerning DNA profiling would be automatically admissible without preliminary inquiry to determine if the expert properly performed a reliable methodology in arriving at his opinion, and further provided that the testifying expert should be required to submit affidavits attesting that he properly performed the protocols involved in DNA profiling.

Since *Prater*, we have on three occasions considered whether a scientific procedure should be considered novel scientific evidence, thus warranting a preliminary hearing or inquiry. We determined that the Horizontal Gaze Nystagmus test used to determine the presence of alcohol by observing the involuntary jerking of the eyeball, is not novel scientific evidence. *Whitson v. State*, 314 Ark. 458, 863 S.W.2d 794 (1993). We reached the same conclusion with regard to human bite mark identification. *Verdict v. State*, 315 Ark. 436, 868 S.W.2d 443 (1993). However, we held that luminol testing for the presence of blood is novel evidence of that requires a preliminary hearing to determine admissibility. *Houston v. State*, 321 Ark. 598, 906 S.W.2d 286 (1995).

In light of the developments in the treatment of DNA evidence, we believe that we should revisit our now four-year-old holding in *Prater*, that DNA profiling is novel scientific evidence. We first observe that in *Prater*, we rejected the majority approach for determining the admissibility of novel scientific evidence as set forth in *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923). The *Frye* standard relies solely on the general acceptance of this theory upon which the evidence is based in the relevant scientific community. We instead adopted the more liberal standard of admissibility, based upon the relevancy approach of the Uniform Rules of Evidence, in particular Rules 401, 402 and 702.

In 1993, the U.S. Supreme Court in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786

(1993), held that the Federal Rules of Evidence supersede the *Frye* test and that the admissibility of expert opinion testimony concerning novel scientific evidence would no longer be limited solely to knowledge or evidence generally accepted as reliable in the relevant scientific community. The Court stated that, under the Rules of Evidence, the trial court must ensure that scientific evidence admitted is not only relevant, but reliable. *Daubert*, *supra*. Although *Jakobetz* was decided prior to *Daubert*, both courts adopted a reliability approach to Rule 702, comparable to the relevancy approach of *Prater* in which reliability is the critical element.

It remains for us to determine whether the trial judge was correct in his findings that DNA profiling is no longer novel scientific evidence requiring a preliminary inquiry to determine its reliability. We agree with his findings and hold that DNA profiling evidence should no longer be viewed as novel scientific evidence requiring a preliminary inquiry beyond the showing that the expert properly performed a reliable methodology in creating the DNA profiles.

The trial court conducted this inquiry in the instant case. Indeed, the trial court noted that the appellant's experts conceded that the laboratory protocol employed by the FBI expert was appropriate, in determining that the evidence was relevant and would be admitted at trial. The trial court also correctly determined that any challenge to the conclusions reached by the state's expert, including the statistical probability of whether the test results constituted a match, would appropriately be made at trial, by cross-examination of the state's experts and presentation by the defendant of his own experts to express differing opinions about the results of the FBI tests and statistical probability of a match.

We note that at trial, appellant's counsel conducted an extensive cross examination of the FBI agent who performed the DNA profiling and the two other prosecution experts who confirmed the DNA matched that of the appellant. During the cross examination of the FBI agent, the following testimony was brought forth:

[Defense Counsel]
Q. — and the DNA in the semen that came from Mrs.

Cannon, when you compare them or look at them, and you say it is a match, you are not saying absolutely that that is Oscar Moore's semen that was found in Mrs. Cannon, are you?

A. Correct. I am not saying absolutely.

Q. And you can't say that and be telling the truth, can you?

A. No. Again, I cannot individualize to the point to say that it came absolutely from one person.

. . .

Q. [Y]ou are not saying that these results established absolutely that the DNA found in the semen in the victim is the DNA of Oscar Moore? You're not saying that at all, are you?

A. I am not saying that absolutely without any question. That's correct.

. . .

Q. . . . it's either [appellant's], or it's somebody who has a DNA profile similar to him? That is your opinion, is it not?

A. That is correct.

In addition, appellant presented two experts who disputed the testimony of the prosecution experts and testified that the probability of a match with appellant's DNA was actually 1 in 2662 and 1 in 355, as opposed to 1 in 500,000, as concluded by the FBI agent. Appellant was thus able to challenge the reliability of the DNA evidence by cross examination and with his own experts at trial.

### d. Lay Opinion Testimony

At trial, a state crime lab report regarding the shoe print was introduced during the testimony of state police investigator Glenn Sligh. The crime lab was unable to identify or eliminate the print found in the victim's bedroom as having been made by appellant's shoe due to the lack of sufficient individual markings. However, the report stated that the shoe sole pattern of the print

was consistent with the pattern on appellant's shoe.

The testimony that appellant complains of came about during the examination of Investigator Sligh. On direct examination by the State, Sligh testified that the sole of the appellant's athletic shoe matched the shoe print found on the center of the victim's bedroom floor by stating, "That's the right foot. This is what we believe to be a match to that picture and to the lifted print." Appellant objected to Mr. Sligh's opinion about the shoe print when he realized that Mr. Sligh apparently did not have the education or training to qualify as an expert. The trial court ruled that although Sligh testified that he had compared shoe prints in several cases, he was not an expert, and his testimony would be allowed as lay opinion testimony pursuant to Ark. R. Evid. 701.

Rule 701 of the Arkansas Rules of Evidence allows admission of opinion testimony by lay witnesses if the opinions or inferences are "(1) [r]ationally based upon the opinion of the witness and (2) [h]elpful to a clear understanding of his testimony or the determination of a fact in issue." *Brown* v. *State*, 316 Ark. 724, 875 S.W.2d 828 (1994). This court has stated that the requirements of Rule 701 are satisfied if the opinion or inference is one which a normal person would form on the basis of the observed facts, but if an opinion without the underlying facts would be misleading, then the objection should be sustained. *Id.* at 729.

Whether to admit relevant evidence rests in the sound discretion of the trial court, and the standard of review is abuse of discretion. *Nooner* v. *State*, 322 Ark. 87, 907 S.W.2d 677 (1995). Rule 701 is not a rule against opinions, but is a rule that conditionally favors them. *Crow* v. *State*, 306 Ark. 411, 814 S.W.2d 909 (1991).

We cannot say that the trial court abused its discretion in allowing the officer in this instance to give lay opinion testimony to show that the appellant's shoe print matched the picture, because, even though the officer was not an expert in that field, the trial court made a determination that he had some experience in that area and he was clearly testifying that the

patterns matched, which was not inconsistent with the crime lab report.

Reversed and remanded.