Clarence Coleman GARR, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Feb. 5, 1971.

H. Foster Pettit, Arthur L. Brooks, Lexington, for appellant.

John B. Breckinridge, Atty. Gen., Mark F. Armstrong, Asst. Atty. Gen., Frankfort, for appellee.

DAVIS, Commissioner.

Clarence Coleman Garr was tried and found guilty by a jury of the offenses of murder, rape, and burglary. The jury fixed punishment on the murder charge at imprisonment for life, on the rape charge at life imprisonment without privilege of parole, and on the burglary charge at imprisonment for ten years, which latter sentence the trial court directed should be served concurrently with the two life sentences.

Josephine Botts, an unmarried lady approximately sixty-five to seventy years of age, was the victim of the felonies for which appellant was convicted. There was no direct evidence of appellant's having committed the crimes, but there was strong circumstantial evidence pointing to his guilt, which shall be discussed later in the opinion.

The appellant, through appointed counsel who have served faithfully and well in defending these charges, presents four charges of error asserting that (1) the court erred in refusing a change of venue; (2) evidence obtained by an illegal search was improperly received; (3) gruesome photographs were received which resulted in prejudice to the appellant; and (4) "the trial court committed prejudicial error when it required, over objection of the defendant, that the defendant submit to the indignity of delivering pubic hairs to the Commonwealth by the hands of the policeman."

About 10:30 p. m. on March 13, 1969, Miss Botts' dead body was discovered by Arthur Walker, who lived in an upstairs room in Miss Botts' home. Walker called some of Miss Botts' friends who arrived shortly, and they notified the Lexington police. The police took photographs of the scene, some of which depicted the victim's body just as it appeared when discovered. The body was supine, on the floor by the bed. The bedclothing was in disarray, as were other articles in the bedroom. On the bed were two lady's purses giving the appearance of having been rifled; an electric clock was stopped at 12:55, the connecting cord having become disengaged from its outlet, probably during a struggle. A man's electric razor and sweat shirt were found in the room, as were a piece of metal and a butcher knife. During the investigation immediately following discovery of the crime, the police raised numerous latent fingerprints, at least one of which was identified as a fingerprint of the appellant. Strong evidence for the Commonwealth indicated that

the razor and the sweat shirt belonged to the appellant. The police were not able to find the appellant readily, although they had incriminating evidence against him which led them to believe that he had perpetrated the offenses.

A post-mortem examination and an autopsy of Miss Botts' body revealed a pair of women's nylon underpants stuffed tightly into the mouth, a fracture of the right forearm, fractures of the anterior fourth and fifth ribs, compression of the larynx, a tear in the posterior vaginal wall, and other cuts and abrasions. The body was attired in a nightgown and housecoat, and some blood was noted on the lower portion of the nightgown. When the body was lifted from the undertaker's cart to the post-mortem table, a large amount of blood was found to have drained from the pelvic region of the body to the cart.

Human blood stains were found on the bedspread, bed sheet, and housecoat at the crime scene. On the nightgown blood stains and semen stains were found. No semen stains were found on any item of evidence other than the nightgown.

Among items of evidence obtained by the police at the crime scene were bits of cotton fiber and pubic and cranial hairs. Subsequent scientific examination disclosed a "large number" of green cotton fibers upon a pair of trousers belonging to appellant which microscopically matched the green cotton fibers in the composition of the bedspread. On the bedspread, as well as on a sheet removed from the bed and on the nightgown and housecoat at the crime scene, were found brown cotton fibers that microscopically matched the brown cotton fibers composing the trousers of appellant. The expert testified:

"It was my conclusion thereafter that the green cotton fibers found on the trousers could have originated from the green bedspread, and the brown cotton fibers found on the bedspread, sheet, the housecoat and the nightgown all could

have originated from this pair of brown cotton trousers."

The same expert witness conducted hair examinations with respect to certain pubic hair and cranial hair found at the crime scene and made microscopic comparisons of those items with known samples of pubic and cranial hair obtained from the appellant. In relating his findings from these examinations, the witness stated:

"These hairs I compared microscopically with the head hairs and pubic hairs of Clarence Coleman Garr, * * * and found that the pubic hair, the Negroid pubic hair, in Commonwealth's Exhibit No. 11 [found at the crime scene] microscopically matched in all observable characteristics the pubic hairs of Clarence Coleman Garr. The head hair fragment found in Commonwealth's Exhibit No. 13 [found at the crime scene] microscopically matched the head hairs of Clarence Coleman Garr which were forwarded and are Commonwealth's Exhibit No. 34.

"My conclusion in this respect was that the pubic hairs and the head hairs I have described originated either from the head and pubic area of Clarence Coleman Garr, Jr., or from another member of the Negro race whose head and pubic hairs are identical in all of the individual microscopic characteristics which we looked at."

It was brought out on cross-examination of the expert witness that hair and fiber do not possess such individual characteristics as to permit positive identification as emanating from any one person or source. The witness expressly said that he could not rule out the possibility that the hair of which he testified did come from some person other than the appellant. Neither could the witness make such an exclusionary conclusion as to the fiber tests.

Garr was arrested on another charge in Orlando, Florida, on April 21, 1969, at which time he furnished an alias and false address. His true identity was discovered by the Orlando police on the basis of fingerprint identification as the result of a wanted bulletin issued by the Lexington Police Department. He was returned to Kentucky, subsequently indicted, and his trial began on September 29, 1969.

■ There was front-page newspaper coverage of the discovery of Miss Botts' body. The newspaper accounts noted some of the incriminating evidence against the appellant, coupled with the efforts of the police department to locate him, and included a somewhat detailed account of the circumstances surrounding his discovery in Orlando. As noted, the appellant presents as his first charge of error that the court should have granted his timely motion for change of venue. The court conducted an extensive hearing on the change-of-venue motion, at which much evidence was heard and numerous news accounts were filed as exhibits.

There was no evidence reflecting that public opinion in Fayette County was so aroused, as to preclude appellant's having a fair trial there. The chief argument of the appellant is that the news accounts were so prominently displayed and contained assertions not admissible in evidence, including the appellant's alleged involvement in a similar incident, that it was impossible for a jury to be drawn from the citizens of the county or any adjoining county who would not be affected by information received by them out of the courtroom and before the trial. Appellant directs our attention to cases such as Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; Irvin v. Dowd, 366 U.S. 717, 6 L.Ed.2d 751, 81 S.Ct. 1639; and others of similar import. It suffices to say that a careful examination of the newspaper accounts and the evidence heard on the motion for change of venue clearly indicates that the trial judge properly resolved the change-of-venue issue. In such matters the trial court is necessarily vested with a sound judicial discretion. Hurley

v. Commonwealth, Ky., 451 S.W.2d 838. This court is persuaded that the evidence adduced in behalf of the appellant falls short of demonstrating any abuse of discretion by the trial court in denying the motion for change of venue.

Appellant's next claim of error involves physical evidence allegedly obtained by illegal search and seizure. At about midnight on Friday, March 14, Police Detective Douglas visited the residence of appellant's parents seeking information about the electric razor found at the crime scene. Neither of appellant's parents was at home, but Officer Douglas talked with appellant's sister, Mrs. Joyce Lyivers. Mrs Lyivers, a married woman about twenty-six years old, was the oldest person at the residence when Officer Douglas called. She identified the razor as the one she had given to the appellant and explained its origin. The razor had the name of C. S. Vanwinkle painted on it, and the police investigation, through that channel, led them to make inquiry concerning the appellant. Mrs. Lyivers was living temporarily with her parents who occupied a residence in Lexington at which the appellant stayed on a very casual basis. Apparently appellant was permitted to sleep at the residence and make it his headquarters whenever he was around Lexington. Appellant was one of ten children, some of whom lived with their parents regularly and others stayed at the residence from time to time. It is apparent from the evidence that the appellant did not have exclusive possession or control of any portion of the dwelling house of his parents. It seems clear from the record that Mrs. Lyivers was at least temporarily in charge of the premises during the absence of her parents and had full authority to admit the officer and permit the search.

At the request of the officer, Mrs. Lyivers accompanied him to the police station and further discussed the razor and identified the sweat shirt, which had been found at the crime scene, as belonging to appellant. When she and the officer returned to the residence, he requested permission to "look around" in the area where appellant had changed clothes when coming in late the night before. Mrs. Lyivers granted the permission and the officer found a pair of trousers and a pair of muddy work shoes belonging to Garr. As already noted, expert witnesses for the Commonwealth testified as to scientific tests conducted on bits of fibers and substance found on the trousers and related that cotton fibers found on the bedspread of Miss Botts were compared microscopically to fibers found upon examination of appellant's trousers. Likewise, it was shown that certain fibers found on the bedspread microscopically matched fibers taken from the surface of the trousers. An expert testified that a blood stain was located on the pants which had significance in light of other evidence reflecting that the victim had bled extensively at the crime scene.

The appellant made timely motion to suppress all evidence concerning the trousers (none was offered concerning the shoes), using a two-pronged attack on the admissibility of such evidence. First, it is argued, Mrs. Lyivers could not validly consent to the search and thereby waive appellant's constitutional rights afforded him by the Fourth Amendment of the U. S. Constitution and Section 10, Kentucky Constitution. Secondly, the appellant argues that even if Mrs. Lyivers could have granted valid permission for a search concerning appellant's possessions, she did not voluntarily grant permission to search, but was induced to do so by reason of police pressure.

In support of the first ground, appellant relies upon Potowick v. Commonwealth, 198 Ky. 843, 250 S.W. 102; Elmore v. Commonwealth, 282 Ky. 443, 138 S.W.2d 956; Hall v. Commonwealth, Ky., 261 S.W.2d 677; and Manning v. Commonwealth, Ky., 328 S.W.2d 421.

In Potowick (as in Duncan v. Commonwealth, 198 Ky. 841, 250 S.W. 101, upon which the decision in Potowick was predi-

cated), the purported consent to search was made by the wife of the defendant. In each of those decisions this court placed reliance upon Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654, in which the Supreme Court specifically noted that it need not determine whether it is possible for a wife, in the absence of her husband, to waive the husband's constitutional rights concerning the search, in a case where it was plain that the wife's consent was based upon implied coercion by reason of the conduct of government agents.

In Elmore v. Commonwealth, supra, this court again relied on Amos v. United States and specifically declined to determine whether the defendant's mother had the authority to consent to the search, since the court found implied coercion.

In Hall v. Commonwealth, Ky., 261 S.W.2d 677, the only excuse offered for an otherwise obviously illegal search of a defendant's residence was a purported consent from the defendant's father-in-law "to search the house at any time the sheriff desired." It was not shown that the father-in-law actually ever undertook to give such consent nor that he had any possessions or other rights in the premises. The court noted that a stranger or a kinsman who does not reside in or have possession and control over the premises to be searched cannot consent to the search of another's home.

In Manning v. Commonwealth, Ky., 328 S.W.2d 421, the purported consent to search Manning's home was given to the sheriff by his wife and sister, pursuant to the sheriff's statement to the women, "I want to know where those clothes are and if you don't tell me I will hold you both as accessories to murder." The court correctly concluded that the purported consent of the wife was coerced and the evidence obtained was inadmissible.

Neither of the four cases just mentioned supports the argument that consent for a search may never be given by one having control of the premises. They relate to the matter of voluntariness of such purported consent to search.

Combs v. Commonwealth, Ky., 341 S.W.2d 774, and Lewis v. Commonwealth, 242 Ky. 628, 47 S.W.2d 66, are apposite in the case at bar. In Combs, the officers searched the premises where the defendant lived and found four stolen tires under the floor. The officers had a search warrant, the legality of which was attacked. The court concluded that it was unnecessary to consider the validity of the search warrant in view of the consent to the search granted the officers by the defendant's grandfather who owned the premises. In reaching its decision in Combs, the court noted that:

"First, the owner or person in charge of a house at the time the search is made may consent to a search, thus waiving the constitutional guaranty against unlawful search and seizure and rendering competent evidence so obtained provided the consent is voluntary and not coerced. * * * In the second place, the only proof is that the premises searched belong to appellant's grandfather; thus, appellant has no standing to question the validity of the search." Id., 341 S.W.2d 774 at page 775. See also annotation reported at 31 A.L.R.2d 1078, et seq.

At 31 A.L.R.2d 1086, it is written:

"It has been held that one having the joint use of occupancy of certain premises, such as a room or a garage, with one asserting the constitutional immunity against unreasonable searches and seizures, may consent to a search of such premises."

In support of that statement, McGinnis v. Commonwealth, 208 Ky. 239, 270 S.W. 832, is cited as one of numerous decisions so holding.

See also Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684, in which the Supreme Court upheld as valid a search of

a duffel bag pursuant to the consent of one who was a joint user of the bag with the defendant.

■ Assuming the appellant had some possessory rights in the searched premises, it is obvious that Mrs. Lyivers had rights at least coextensive with his. Hence, it is concluded that Mrs. Lyivers had the authority to grant permission for the search and that appellant may not complain, provided her consent was voluntarily given.

Nothing in the record, either in the preliminary hearing testing the validity of the search or in the evidence presented before the jury, warrants the contention that Mrs. Lyivers granted consent to the search as the result of coercion, expressed or implied. During the course of the trial, Mrs. Lyivers was asked by appellant's counsel whether she voluntarily consented to the search and she made this answer: "Well, I did it because they were officers and I presumed if they wanted to look, they could have looked anyway." No request was made for an admonition to the jury respecting the voluntariness of the consent as directed in Bradley v. Commonwealth, Ky., 439 S.W.2d 61. No other evidence suggesting coercion was heard, and the overall tenor of Mrs. Lyivers' testimony refutes her bare statement just quoted. In these circumstances we find no merit in the contention that the consent to the search was coerced.

■ There is no merit in the claimed error respecting the admission of so-called gruesome photographs. Within the rationale expressed in Johnson v. Commonwealth, Ky., 445 S.W.2d 704; Napier v. Commonwealth, Ky., 426 S.W.2d 121; and Salisbury v. Commonwealth, Ky., 417 S.W.2d 244, the photographs were properly admitted in evidence. They portrayed physical conditions pertinent to establishing the elements of each of the offenses charged. As is to be expected, the matter portrayed is not pleasing to the beholder, but nothing depicted may be characterized as so inflammatory or gruesome as to preclude them from the jury's consideration.

■ Finally, it is contended that appellant's constitutional protection against self-incrimination was violated by the court's order requiring him to submit pubic hair for scientific examination. Reliance is had upon United States v. Townsend (U.S.D.C. District of Columbia, 1957) 151 F.Supp. 378. In Townsend, the District Court ruled that the Fifth Amendment's due-process provision precluded admission of certain evidence. There the defendant was charged with taking immoral, improper and indecent liberties with a minor female. While the defendant was in police custody, he was forced, over his vehement protest, to submit to having his penis swabbed with four chemically treated patches of cotton with the view to establishing the presence of blood. Indeed, blood was so detected, but its probable origin was not determinable.

The District Court in Townsend apparently rested its ruling upon a finding that Fifth Amendment "due process" (applicable to Federal officers) was violated, although the court noted that "physical evidence," as distinguished from "verbal evidence," also may be within the ambit of Fifth Amendment protection against self-incrimination, applicable to the states via the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653.

In Townsend, it was shown that the defendant was physically forced to submit to the examination, over his repeated protests and his ignored demands for legal counsel. The court relied much on Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396. In Rochin, the Supreme Court held that the defendant's constitutional right to "due process" was violated by forcing him to submit to the pumping of his stomach, resulting in disgorging capsules containing morphine. In separate concurring opinions Mr. Justice Black and Mr. Justice Douglas pointed out that they would put the result on the constitutional

protection against self-incrimination, as distinguished from the narrower "due-process" holding.

In Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, the Supreme Court upheld the right of the prosecution to withdraw blood from the defendant for submission to scientific testing for alcoholic content in a prosecution for driving an automobile while under the influence of intoxicating liquor. The Court laid emphasis on the fact that the blood was withdrawn under medically acceptable conditions, insofar as due process was concerned. On the critical question of self-incrimination, the Court ruled that the evidence so obtained was admissible. In reaching that conclusion, the majority opinion notes:

> "Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis. Petitioner's testimonial capacities were in no way implicated; indeed, his participation, except as a donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone. Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds." Id., 384 U.S. at 765, 86 S.Ct. at 1832, 16 L.Ed.2d at 916–917.

In the present case the trial judge entered a pretrial order, on motion of the Commonwealth, directing appellant to submit a sample of his pubic and cranial hair. The order directed that appellant's counsel be present when the samples were obtained, and counsel was present. There is no suggestion of physical force or personal indignity as appeared in Townsend and Rochin. In these circumstances, no error appears.

The judgment is affirmed.

All concur.