Terry M. JOHNSON, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 96–SC–0577–MR.

Supreme Court of Kentucky.

Dec. 16, 1999.

Rehearing Denied March 23, 2000.

Daniel T. Goyette, Louisville, Bruce P. Hackett, Deputy Appellate Defender of the Jefferson District, Louisville, for Appellant.

A.B. Chandler, III, Attorney General, Frankfort, Perry T. Ryan, Criminal Appellate Division, Office of Attorney General, Frankfort, for Appellee.

Opinion of the court by Justice COOPER.

Sometime prior to 12:30 p.m. on June 12, 1995, Appellant Terry Johnson's father, Stanford Johnson, was strangled to death in their home. A Jefferson Circuit Court jury convicted Appellant of his father's murder and sentenced him to imprisonment for life. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b). The primary issue on appeal is whether the testimony of a hair analysis expert should have been suppressed. Appellant

also asserts that the Commonwealth should not have been granted a continuance after the completion of jury selection, that the jury was improperly instructed on the offense of murder, and that a mistrial should have been declared after a juror and a deputy sheriff engaged in an ex parte conversation while the jury was deliberating its verdict.

## I. FACTS.

Appellant and his father shared a residence in Jefferson County, Kentucky. Between 12:30 and 12:45 p.m. on Monday, June 12, 1995, Appellant telephoned his cousin, Lisa McDowell, and told her that he thought his father was dead. When McDowell inquired whether the victim had been sick, Appellant replied, "I don't know, I haven't been here for two days." At 12:56 p.m., Appellant telephoned the Jefferson County 911 emergency service and advised that he had found his father lying on a couch and that, while attempting to arouse him, he noticed that the victim's body was cold. When Lisa McDowell arrived at the residence, she immediately noticed cuts and abrasions on the victim's body which she had not noticed when she last saw him several days before. It was subsequently determined that the victim had been strangled to death.

Because the residence was equipped with security doors and there was no evidence of forced entry, Appellant became an immediate suspect. A blood spot found on the victim's clothing was consistent with Appellant's blood type, which is found in only three of every one thousand persons. Hairs were found between the fingers of the victim's left and right hands. The hair found in the victim's right hand was subsequently determined to have the same characteristics as hair samples obtained from Appellant's head. The hair found in the victim's left hand was determined to have the same characteristics as hair samples obtained from the victim's head. While obtaining hair and blood samples from Appellant, Dr. William Smock, the assistant medical examiner, noticed that Appellant had a ¼ inch abrasion across the bridge of his nose and numerous scrapes, contusions, and abrasions on his neck, left shoulder, left upper chest, right arm, and right knee, all of which appeared to be of recent origin. Appellant told Dr. Smock that he sustained those injuries while changing a flat tire. Dr. Smock testified at trial that he had never before seen a patient who had sustained such injuries while changing a tire. Four witnesses testified that they noticed no marks or bruises on Appellant during their respective encounters with him between 4:30 p.m. and 11:30 p.m. on June 11.

Appellant told the police that his father was "hard to get along with," that he and his father had had problems in the past, and they had argued a great deal. He denied ever hitting his father, but claimed that his father once "took a slug" at him. Appellant further told the police that he left home at about 4:00 or 5:00 p.m. on June 11 and did not return to the house until about 6:00 or 6:30 a.m. the next morning. (A neighbor testified that she saw Appellant in the back yard of the house at 12:00 a.m. on June 12.) Upon returning home, Appellant noticed nothing unusual and went to bed. He awoke at about 11:00 or 11:30 a.m. and went to a restaurant and then to a department store. When he returned home at about 12:30 or 12:45 p.m., he found his father dead. Appellant was the beneficiary of his father's $15,000 life insurance policy.

An autopsy revealed multiple injuries to various parts of the victim's body, including a fracture of the top vertebra of the neck and a fracture of the hyoid bone, which is located deep within the neck. The cause of death was manual strangulation.

## II. HAIR COMPARISON EVIDENCE.

Appellant filed a motion in limine to suppress evidence that the hair found between the fingers of the victim's right hand had the same characteristics as hair

samples removed from Appellant's head. This fact had been determined by microscopic comparison performed by a serologist at the Kentucky State Police Crime Laboratory. After determining that evidence of hair analysis by microscopic comparison has been routinely admitted into evidence in this jurisdiction for many years, the trial judge first overruled the motion without an evidentiary hearing. However, the trial judge subsequently allowed Appellant to introduce evidence in support of his motion by way of avowal. Appellant then proffered evidence consisting of the published opinion in the case of *Williamson v. Reynolds*, 904 F.Supp. 1529 (E.D.Okla.1995), in which a federal district judge in Oklahoma concluded that hair analysis by microscopic comparison no longer satisfies the test of reliability enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and an inconclusive cross-examination of the Commonwealth's expert serologist, who denied any knowledge of the studies and statistics cited in the *Williamson* opinion. After considering this evidence, the trial judge again overruled the motion to suppress.

■ Prior to the United States Supreme Court's decision in *Daubert, supra,* the test for admissibility of scientific evidence was whether the scientific method or theory at issue had been generally accepted in the relevant scientific community. *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); *Harris v. Commonwealth*, Ky., 846 S.W.2d 678 (1992). Under *Daubert*, adopted by this Court in *Mitchell v. Commonwealth*, Ky., 908 S.W.2d 100 (1995), *overruled on other grounds, Fugate v. Commonwealth*, Ky., 993 S.W.2d 931 (1999), the *Frye* test of general acceptance is but one factor to be considered in determining the admissibility of scientific evidence under FRE (or KRE) 702. Other factors include whether the method or theory can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation. *Daubert, supra,* 509 U.S. at 592–95, 113 S.Ct. at 2796–97.

*Daubert* also recognized that some scientific methods, techniques and theories are so firmly established as to be proper subjects of judicial notice pursuant to FRE 201(b)(2). *Daubert, supra,* 509 U.S. at 592 n. 11, 113 S.Ct. at 2796 n. 11. Thus, in *United States v. Martinez*, 3 F.3d 1191, 1197 (8th Cir.1993), *cert. denied,* 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994), it was held that once an appropriate appellate court holds that the *Daubert* test of reliability is satisfied, lower courts can take judicial notice of the reliability and validity of the scientific method, technique or theory at issue. Courts are "right to admit or exclude much evidence without 'reinventing the wheel' every time by requiring the parties to put on full demonstrations of the validity or invalidity of methods or techniques that have been scrutinized well enough in prior decisions to warrant taking judicial notice of their status." 3 C. Mueller and L. Kirkpatrick, *Federal Evidence* § 353, at 657 (2d ed.1994). A substantial consensus in that regard has emerged in recent years. *E.g., United States v. Beasley*, 102 F.3d 1440 (8th Cir.1996), *cert. denied,* 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997); *United States v.. Booker,* 70 F.3d 488, 490 n. 5 (7th Cir.1995), *cert. denied,* 517 U.S. 1111, 116 S.Ct. 1334, 134 L.Ed.2d 484 (1996); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 n. 10 (3d Cir.1994), *cert. denied,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995); *United States v. Jakobetz*, 955 F.2d 786, 799–800 (2d Cir .1992), *cert. denied,* 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *State v. Coon,* 974 P.2d 386 (Alaska 1999); *Moore v. State,* 323 Ark. 529, 915 S.W.2d 284, 293 (1996); *Ford Motor Co. v. Ammerman,* 705 N.E.2d 539, 551 (Ind.Ct.App.1999); *State v. Witte,* 251 Kan. 313, 836 P.2d 1110, 1121 (1992); *Schultz v. State,* 106 Md.App. 145, 664 A.2d 60, 71 (1995); *State v. Pennington,* 327 N.C. 89, 393 S.E.2d 847 (1990);

*State v. O'Key*, 321 Or. 285, 899 P.2d 663, 673 n. 8 (1995); *DiPetrillo v. Dow Chem. Co.*, 729 A.2d 677 (R.I.1999); *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied*, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994).

We recently held in *Fugate v. Commonwealth, supra*, that the scientific reliability of the RFLP and PCR methods of DNA testing has been sufficiently established that a *Daubert* hearing is no longer required before such evidence is admissible at trial. For other types of scientific methods and techniques which have been recognized as reliable by our courts see *Commonwealth v. Wirth*, Ky., 936 S.W.2d 78 (1996) (breath testing to determine blood alcohol content); *Bartlett v. Commonwealth, ex rel. Calloway*, Ky., 705 S.W.2d 470 (1986) and *Perry v. Commonwealth, ex rel. Kessinger*, Ky ., 652 S.W.2d 655 (1983) (HLA blood typing to determine paternity); *Garr v. Commonwealth*, Ky., 463 S.W.2d 109 (1971), *cert. denied*, 403 U.S. 910, 91 S.Ct. 2219, 29 L.Ed.2d 687 (1971) (fiber analysis); *Morris v. Commonwealth*, 306 Ky. 349, 208 S.W.2d 58 (1948) (ballistics analysis); *Shelton v. Commonwealth*, 280 Ky. 733, 134 S.W.2d 653, 657 (1939) (fingerprint analysis). On the basis of those decisions, trial judges in Kentucky can take judicial notice that those methods or techniques have achieved the status of scientific reliability.

■ However, judicial notice does not preclude proof to the contrary.[1] "[A] matter need not be beyond dispute to be part of a court's reasoning." Commentary to KRE 201, Evidence Rules Study Committee, Final Draft (1989). In *State v. Coon, supra*, the Alaska Supreme Court noted that it "seems unlikely that methodologies that were admitted under *Frye* and that remain generally accepted in the appropri-

ate community will be excluded, *absent affirmative evidence of unreliability.*" *Coon*, 974 P.2d at 398 (emphasis added). Thus, the fact that a particular scientific method, technique or theory was once deemed scientifically reliable does not preclude subsequent proof that it is no longer deemed reliable. In this respect, however, judicial notice relieves the proponent of the evidence from the obligation to prove in court that which has been previously accepted as fact by the appropriate appellate court. It shifts to the opponent of the evidence the burden to prove to the satisfaction of the trial judge that such evidence is no longer deemed scientifically reliable. The proponent may either rest on the judicially noticed fact or introduce extrinsic evidence as additional support or in rebuttal.[2]

■ As previously noted, evidence of hair analysis by microscopic comparison has been admissible in this Commonwealth for many years. *E.g., Wilhite v. Commonwealth*, Ky., 574 S.W.2d 304 (1978); *Sherley v. Commonwealth*, Ky., 558 S.W.2d 615 (1977), *cert. denied*, 435 U.S. 999, 98 S.Ct. 1655, 56 L.Ed.2d 89 (1978); *Garr v. Commonwealth, supra; Mitchell v. Commonwealth*, Ky., 280 S.W.2d 189 (1955); *Acrey v. Commonwealth*, 312 Ky. 732, 229 S.W.2d 748 (1950). Although we have never specifically addressed the scientific reliability of this method of hair analysis, we must assume that it at least satisfied the *Frye* test of general acceptance; for otherwise, the evidence would never have been admitted in the first place. The absence in our previous opinions of any in-depth analysis under the "general acceptance" test was probably due to the overwhelming acceptance of this procedure as a reliable scientific method for the past fifty years. *See*

---

1. FRE 201 differs from KRE 201 only with respect to subsection (g) which pertains to a jury instruction regarding a judicially noticed fact. Here, we are not dealing with a jury issue, but with a question of admissibility under KRE 104(a), which does not implicate KRE 201(g).

2. Of course, even if the suppression motion is overruled, the opponent of the evidence may attack its credibility at trial. *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986).

*generally* G. Sarno, Annotation, *Admissibility and Weight, in Criminal Case, of Expert or Scientific Evidence Respecting Characteristics and Identification of Human Hair*, 23 A.L.R.4th 1199 (1983); and see especially the following cases which specifically hold that human hair analysis by microscopic comparison is an accepted and reliable scientific method or technique: *McGrew v. State*, 682 N.E.2d 1289 (Ind. 1997); *Commonwealth v. Tarver*, 369 Mass. 302, 345 N.E.2d 671 (1975); *People v. Vettese*, 195 Mich.App. 235, 489 N.W.2d 514 (1992); *State v. White*, 621 S.W.2d 287 (Mo.1981); *State v. Harrison*, 218 Neb. 532, 357 N.W.2d 201 (1984); *Bolin v. State*, 114 Nev. 503, 960 P.2d 784 (1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999); *People v. Allweiss*, 48 N.Y.2d 40, 421 N.Y.S.2d 341, 396 N.E.2d 735 (1979); *Bryan v. State*, 935 P.2d 338, 359 n. 62 (Okla.Crim.App.1997), *cert. denied*, 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997); *State v. Lerch*, 296 Or. 377, 677 P.2d 678 (1984); *State v. Lord*, 117 Wash.2d 829, 822 P.2d 177 (1991), *cert. denied*, 506 U.S. 856, 113 S.Ct. 164, 121 L.Ed.2d 112 (1992). Based upon the overwhelming acceptance of this evidence by other jurisdictions, as well as our own history of routine admission of this evidence at trial, trial courts in Kentucky can take judicial notice that this particular method or technique is deemed scientifically reliable.

■ We now address whether the evidence proffered by Appellant satisfied his burden of proof that hair analysis by microscopic comparison is no longer deemed scientifically reliable. We conclude that it did not.

Appellant primarily relies on *Williamson v. Reynolds, supra*, which was before the federal district court for the eastern district of Oklahoma on a petition for a writ of habeas corpus. Although that court's decision was affirmed by the Tenth Circuit Court of Appeals because the petitioner had been denied effective assistance of counsel, the district court's holding that hair analysis by microscopic comparison is no longer deemed scientifically reliable was set aside on grounds that in deciding a federal habeas petition, the standard is whether admission of the evidence at issue amounted to a denial of constitutional due process, and that whether to admit the evidence under a *Daubert* analysis is a state court prerogative.[3] *Williamson v. Ward*, 110 F.3d 1508, 1522–23 (10th Cir. 1997).

■ Appellant did not introduce into the record of this case any of the evidence relied on in *Williamson v. Reynolds, supra;* thus, that evidence was not available for the trial judge's (or our) consideration. While we may consider for persuasive purposes the holding of another court in a similar case, we cannot adopt by judicial notice the *evidence* introduced in that case for the purpose of proving a similar proposition in another case. *Cf. Jones v. Bell*, 304 Ky. 827, 202 S.W.2d 641 (1947). Since the legal conclusion reached in *Williamson v. Reynolds* was reversed by its own appellate court, and thus stripped of any precedential value, and since none of the evidence relied on in *Williamson* was introduced in this case, the mere filing of a copy of the written opinion in *Williamson* into the record of this case was legally irrelevant.

Appellant finds significance in the admissions by the Commonwealth's expert that the same person can possess hairs of different characteristics, and that there are no statistics as to how many different people have hair with the same characteristics. However, the fact that Appellant's hair sample was found to have the same characteristics as the hair found between the fingers of the victim's right hand is just as relevant as the fact that blood of Appellant's blood type was found on the

3. In fact, the Oklahoma Court of Criminal Appeals subsequently rejected the reasoning by which the judge in *Williamson v. Reynolds* concluded that hair analysis by microscopic comparison does not withstand *Daubert* scrutiny. *Bryan v. State, supra.*

victim's body. *Cf. Wilhite v. Commonwealth, supra*, at 306. Appellant also finds significance in the fact that no probability statistics exist with respect to hair characteristics as is the case with respect to blood types and DNA evidence. Yet, we held in *Sholler v. Commonwealth*, Ky., 969 S.W.2d 706 (1998) that evidence of a DNA match is admissible even absent evidence regarding the statistical probability of such a match. As here, the evidence in both *Wilhite* and *Sholler* was admissible to prove that the defendant was not *excluded* as the source of the evidence found at the crime scene. In that respect, it is just another item of circumstantial evidence to be considered along with other relevant evidence introduced at trial. Appellant further complains that the Crime Laboratory conducts no proficiency testing with respect to hair analysis as it does with respect to DNA analysis. However, DNA analysis is a chemical analysis, the accuracy of which depends upon more than the knowledge and skill of the chemist; whereas the accuracy of hair analysis by microscopic comparison depends solely on the knowledge and expertise of the person conducting the microscopic comparison. These facts pertain more to the weight to be accorded to hair analysis evidence than to its admissibility.

■ Finally, Appellant finds fault in the Commonwealth's failure to inquire of its expert with respect to each of the five factors discussed in *Daubert, supra*, 509 U.S. at 592–95, 113 S.Ct. at 2796–97. Since Appellant failed to introduce any evidence to prove the unreliability of hair analysis by microscopic comparison, the Commonwealth had no obligation to introduce affirmative evidence to prove its reliability, but could rely entirely on the judicially noticed fact that the reliability of this scientific method has previously been accepted by this Court. Regardless, the United States Supreme Court made it clear in *Daubert* that the factors enumerated therein do not constitute a "definitive checklist or test." *Id.* at 593, 113 S.Ct. at

2796. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court further clarified that the list of factors was meant to be helpful, not definitive.

Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged. It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist.

*Id.* at ——, 119 S.Ct. at 1175. In other words, a court may consider one or more or all of the factors mentioned in *Daubert*, or even other relevant factors, in determining the admissibility of expert testimony. The test of reliability is flexible and the *Daubert* factors neither necessarily nor exclusively apply to all experts in every case. *Kumho Tire Co., Ltd., supra*, 526 U.S. at ——, 119 S.Ct. at 1175–76.

### III. CONTINUANCE.

This case was initially called for trial on the afternoon of March 20, 1996. Several hours were consumed hearing and resolving motions in limine, after which it was discovered that there were insufficient jurors remaining in the jury pool to impanel a jury in compliance with KRS 29A.060(2). Thus, jury selection was postponed until the next day and court was adjourned. Court reconvened on March 21 and a jury was finally selected at approximately 2:30 p.m. on that date. However, the jury was never actually "sworn" pursuant to RCr 9.42, *i.e.*, the oath to the jury required by KRS 29A.300 and Part II, section 30 of the Administrative Procedures of the Court of Justice was never administered. Instead, the judge and counsel lapsed into a discussion of what to do about the absence of Dr. William Smock, a crucial witness for the Commonwealth.

It is obvious from reviewing the videotape of this discussion that both counsel

and the trial judge already knew that Dr. Smock was under subpoena as a witness for the prosecution in a criminal trial in Jeffersonville, Indiana, on March 20, 1996. It was assumed that he would then be available to testify in Appellant's case on March 21, following which he was scheduled to be out of state on business for a week. However, at the conclusion of Dr. Smock's March 20 testimony in Indiana, the defendant in that case insisted that he be kept available for recall as a defense witness. The upshot was that at 2:30 p.m. on March 21, Dr. Smock was still in court in Indiana and did not know when he would be available to testify in Appellant's case in Jefferson County, Kentucky. The Commonwealth first moved for a two-week recess until Dr. Smock could return from his out-of-state business. The trial judge decided that this was not feasible because other trials had been scheduled for the interim. The prosecutor then advised that she could not announce ready for trial. Finding that Dr. Smock's testimony was critical to the Commonwealth's case, the judge discharged the jury and granted a continuance until April 16, 1996, at which time a new jury was selected and the case was tried to a conclusion.

■ Appellant first claims that to grant a mistrial over his objection after the jury was empaneled violated the constitutional proscription against double jeopardy. U.S. Const. amend. V; Ky. Const. § 13. Although KRS 505.030(4) provides that jeopardy attaches when the first witness is sworn, the United States Supreme Court has held that jeopardy attaches in a jury trial when the jury is "empaneled *and sworn.*" *Crist v. Bretz*, 437 U.S. 28, 38, 98 S.Ct. 2156, 2162, 57 L.Ed.2d 24 (1978) (emphasis added). Since the jury empaneled on March 21, 1996 was never sworn, jeopardy never attached. Thus the only issue is whether the trial judge abused his discretion in granting a continuance.

■ Although Appellant claims the prosecutor announced ready for trial on March 20, 1996, a review of the videotape of the proceedings reveals that neither party ever officially announced ready. A fair interpretation of what occurred on March 21, 1996 is that both counsel and the trial judge knew that Dr. Smock's availability as a witness was problematical, and that the judge allowed the proceedings to go as far as he could without jeopardy attaching in the hope that a trial could be held. Whether to grant a continuance is generally within the sound discretion of the trial court. *Estep v. Commonwealth*, Ky., 663 S.W.2d 213 (1983). Among the factors to be considered in determining whether a continuance should be granted are length of delay, whether the delay was purposeful and caused by the moving party, and whether denying the continuance would lead to identifiable prejudice. *Snodgrass v. Commonwealth*, Ky., 814 S.W.2d 579, 581 (1991). Dr. Smock's absence was not the fault of the Commonwealth and his testimony was clearly crucial to the Commonwealth's case. The length of delay resulting from the continuance was less than a month. We conclude that the trial judge did not abuse his discretion in granting the continuance.

### IV. MURDER INSTRUCTION.

■ The indictment charged Appellant with murder "by intentionally or under circumstances manifesting extreme indifference to human life wantonly caus[ing] the death of Stanford M. Johnson." The instruction in this case was identical to that given in *Hudson v. Commonwealth*, Ky., 979 S.W.2d 106, 109 (1998), *i.e.*, a combination instruction which permitted the jury to find Appellant guilty of murder under either KRS 507.020(1)(a) (intentional murder) or KRS 507.020(1)(b) (wanton murder). Since the jury returned a general verdict simply finding Appellant guilty of murder, it is impossible to know whether the jury believed Appellant was acting intentionally or wantonly when the murder was committed. As in *Hudson*, Appellant claims he was denied his right to a unanimous verdict. As noted in *Hudson*, this is

a non-issue if the evidence would have supported either theory. *See also Barbour v. Commonwealth*, Ky., 824 S.W.2d 861, 863 (1992), *overruled on other grounds, Elliott v. Commonwealth*, Ky., 976 S.W.2d 416 (1998); *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 677 (1984), *cert. denied*, 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984); *Hayes v. Commonwealth*, Ky ., 625 S.W.2d 583, 584 (1981); *Wells v. Commonwealth*, Ky., 561 S.W.2d 85, 88 (1978). Appellant, as did the defendant in *Hudson*, claims the evidence in this case proved only an intentional act and, thus, it was error to instruct on wanton murder.

In *Hudson*, the victim was also killed by manual strangulation. Hudson testified that he only pushed his victim down, then panicked and "went crazy." We held that such evidence was sufficient to support a conviction of wanton murder. Here, Appellant neither testified nor confessed to killing his father, so there was no direct evidence to prove mens rea.

> Intent to kill can be inferred from the extent and character of a victim's injuries.... However, whether a defendant actually has an intent to kill remains a subjective matter. *Smith v. Commonwealth*, Ky., 737 S.W.2d 683, 688 (1987). Moreover, neither the inference nor the presumption of intent are mandatory. Indeed, if they were, most trials would be mere formalities.
>
> Once the facts of a killing are established, whether the act itself is murder depends upon the mind of the killer. The state of that mind at the time of the killing is almost never clear, not even to the defendant himself....
>
> To say that the method and means of [the victim's] death only support an instruction on intentional murder is to make the inference of intent mandatory.

*Hudson, supra*, at 110.

*Hudson* is determinative of this issue. From the evidence presented here, a jury could reasonably have believed either (1) Appellant intentionally killed his father, or (2) he had an argument with his father, which deteriorated into a physical altercation, during which Appellant choked his father ultimately to death without ever forming the specific intent to kill, but nonetheless creating a substantial and unjustifiable risk that death would result. Thus, the jury was properly instructed on both intentional and wanton murder.

## V. EX PARTE COMMUNICATION WITH JUROR.

▮ Approximately ten minutes after the jury began their deliberations, a deputy sheriff entered the jury room for the purpose of delivering lunch menus. A juror asked the deputy if there would be a separate sentencing phase of the trial in the event Appellant was found guilty and the deputy answered, "Yes." We agree with Appellant that this brief colloquy violated RCr 9.68, RCr 9.70, RCr 9.74 and KRS 29A.320(1). However, we do not agree that this violation required a mistrial. The trial judge informed the jury at the beginning of the trial that if they returned a guilty verdict, a second, penalty phase of the trial would take place. Thus, the information imparted by the deputy sheriff was nothing more than the jury had already been told.

▮ Long ago, we joined the trend away from a strict or technical application of the rules forbidding conversations with or among jurors. *Cosby v. Commonwealth*, Ky., 451 S.W.2d 653 (1970). A mistrial is not warranted if the conversation was "innocent" and matters of substance were not involved. *Talbott v. Commonwealth*, Ky., 968 S.W.2d 76, 86 (1998). "The true test is whether the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Id.* (quoting *Byrd v. Commonwealth*, Ky., 825 S.W.2d 272, 275 (1992)). *Compare Young v. State Farm Mut. Auto. Ins. Co.*, Ky., 975 S.W.2d 98 (1998), wherein the jury asked the bailiff for certain depositions which had been read at trial and were

informed by the bailiff that they could not have the depositions. If there had been compliance with RCr 9.74, the judge could have informed the jurors of their right to have the testimony reread in open court. No such prejudice resulted from the information imparted to the juror in this case.

Accordingly, the judgment of conviction and the sentence imposed by the Jefferson Circuit Court are affirmed.

GRAVES, JOHNSTONE, KELLER and WINTERSHEIMER, JJ., concur.

STUMBO, J., dissents by separate opinion, with LAMBERT, C.J., joining that dissent.

STUMBO, Justice, dissenting.

Respectfully, I must dissent. As the majority correctly notes, a single hair, said to be consistent with Appellant's, was found between the fingers of the victim's hand. I find it disconcerting to think that Appellant's future is, both literally and figuratively, hanging by a hair. It seems to me that before we permit Appellant to be convicted by testimony that in all likelihood "his" hair was found in the victim's hand, we must be absolutely sure that the expert hair analysis testimony was sufficiently reliable to be presented to a jury. Unfortunately, no such reliability was established in this case, and the hair evidence went before the jury despite our clear mandate in *Mitchell v. Commonwealth*, Ky., 908 S.W.2d 100, 102 (1995), that "pursuant to KRE 702 and *Daubert*, expert scientific testimony must be proffered to a trial court. The trial court judge *must conduct a preliminary hearing on the matter utilizing the standards set forth in Daubert.*" (Emphasis added.)

The majority circumvents this requirement by proclaiming that because hair analysis has been admissible in Kentucky for many years, presumably because it met the *Frye* test of general acceptance, "trial judges in Kentucky may take judicial notice that [it has] achieved the status of scientific reliability." In support of the proposition that judicial notice is appropriate in this case (and in any other case in which the scientific evidence at issue has been previously admitted in Kentucky's courts) the majority cites a footnote from *Daubert.* To wit, the majority writes: "*Daubert* also recognized that some scientific methods, techniques and theories are so firmly established as to be proper subjects for judicial notice pursuant to FRE 201(b)(2)." *See Daubert,* 509 U.S. at 592 n. 11, 113 S.Ct. at 2796 n. 11. While not untrue, the majority takes this statement from *Daubert* entirely out of context in order to achieve its desired goal. What the *Daubert* court really said was this:

> Although the *Frye* decision itself focused exclusively on "novel" scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence. Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended. Indeed, *theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice* under Federal Rule of Evidence 201.

*Daubert,* 509 U.S. at 592 n. 11, 113 S.Ct. at 2796 n. 11 (emphasis added). It seems clear to me that the method of hair comparison analysis at issue here is not "so firmly established as to have attained the status of scientific law," and, thus, it is in no way a proper subject of judicial notice. Rather, judicial notice of scientific evidence should be reserved for the rare occasion when the evidence sought to be admitted is seemingly beyond dispute, such as, for example, evidence that the sun rises every day in the east, or acknowledgment of the law of gravity.

Because judicial notice is not appropriate in a case, such as this, involving scientific evidence which does not rise to the level of scientific law, it follows that before the expert scientific evidence may be admitted at trial, it must first be scrutinized

for its reliability and relevance, pursuant to *Daubert*'s guidelines. It matters not that the evidence in this case has long been accepted in this Commonwealth. *Daubert* created a separate and distinct new standard against which all expert scientific testimony must be tested before it may be admitted. It in no way limited the requirement of scrutiny for reliable and relevant methodology as a prerequisite to admissibility to only those types of scientific evidence considered "novel."

Although both *Mitchell* and *Daubert* were specifically confronted with the admissibility of "novel" scientific evidence,[1] the holding of *Daubert* (and of *Mitchell*) clearly applied to all scientific evidence sought to be admitted under FRE 702 (KRE 702). In fact, the *Daubert* Court acknowledged that scientific knowledge is not static and fixed, but rather, that our understanding of certain scientific theories and techniques is constantly evolving, and that scientific knowledge is ever-expanding. *Daubert*, 509 U.S. at 596–97, 113 S.Ct. at 2798–99, 125 L.Ed.2d at 485. Thus, as the *Daubert* Court put it, "[s]cientific conclusions are subject to perpetual revision" and "hypotheses . . . that are incorrect will eventually be shown to be so." *Id*.

It follows that, although a particular scientific theory, procedure or technique, such as hair comparison analysis, might have been solidly accepted by the relevant scientific community at one time, it is not outside the realm of possibility that such evidence might, with the development of more advanced techniques and testing procedures or the scrutiny of the scientific community, fall into disrepute or be proven to be unreliable. For this reason, the *Daubert* Court took pains to point out that its holding was not limited to "novel" scientific techniques, but that "well-established propositions" were also within the ambit of its holding. *Daubert*, 509 U.S. at 592 n. 11, 113 S.Ct. 2786.

Accordingly, I would hold the trial court in this case erred in denying Appellant's request for a *Daubert* hearing into the reliability of the Commonwealth's proffered hair comparison analysis evidence. The majority, on the other hand, declares that no such hearing is required if the evidence sought to be admitted has long-been accepted by Kentucky courts. Rather, the opponent of the evidence now has the burden to prove the evidence "is no longer deemed scientifically reliable." I believe the majority's holding improperly removes the burden of demonstrating admissibility from the proponent of the evidence, and instead requires the opponent of the evidence to prove its inadmissibility. Such has never been the law of this Commonwealth. *Daubert*, as did its predecessor *Frye*, establishes a hurdle of admissibility which must be overcome by the proponent of the evidence before it may be admitted at trial. While it is true that *Daubert* established a much more flexible standard of admissibility than did *Frye*, its standard must nevertheless be met before evidence may be deemed admissible.

The rule announced in *Daubert* and followed in *Mitchell* was designed to be flexible. Its purpose is to ensure that relevant and reliable evidence is not excluded from trial simply because the evidence is "novel" and has not yet gained general acceptance in the scientific community. At the same time, the rule provides litigants the opportunity to challenge the reliability of scientific evidence which, though once embraced by the courts and the relevant scientific community, might now prove to be less reliable than once thought. In my opinion, we have made an unwarranted and unwise departure from that rule today.

LAMBERT, C.J., joins.

---

1. *Mitchell* was concerned with the admissibility of DNA evidence and *Daubert* revolved around the question of whether the drug Bendectin caused birth defects in humans.